MANN BOUDOIR CAR CO. v. DUPRE.

(Circuit Court of Appeals, Fifth Circuit. February 27, 1893.)

No. 99.

1. SLEEPING CARS—EJECTMENT OF PASSENGER FROM BERTH—DAMAGES.
   Where an unlawful expulsion from a berth of a sleeping car is the proximate cause of a married woman's miscarriage, the sleeping-car company is liable for such injury, although its servants were ignorant of the woman's condition when they expelled her.

2. SAME.
   Where a sleeping-car company has reserved certain berths for passengers getting on at a certain station, and before the train reaches the sta-

tion its conductor erroneously sells one of the berths so reserved, the conductor may, a reasonable time before reaching such station, notify the passenger of his error, and tender another berth equal in accommodation, and the passenger has no cause of action if she refuses to accept this, and voluntarily leaves the car.

3. SAME—PAROL EVIDENCE TO CONTRADICT "BERTH CHECK."

In an action against a sleeping-car company to recover damages for being unlawfully ejected from a berth, the plaintiff may contradict by parol evidence the recital on his "berth check" as to the berth bought by him.

4. TRIAL—INSTRUCTIONS—REFUSAL TO GIVE.

To save an error in the refusal to give a proper special charge, such special charge must not be asked in the aggregate with other charges in any one of which there is anything objectionable.

5. SAME.

Although a feature of the case may rightfully call for a proper special charge, still if the charge asked for is too broad, the court may rightfully refuse to give such charge.

In Error to the Circuit Court of the United States for the Southern District of Mississippi.

Action by Florence C. Dupre against the Mann Boudoir Car Company to recover damages for illegal expulsion from the berth of a sleeping car. The circuit court gave judgment for plaintiff. Defendant brings error. Reversed.

Percy Roberts, (Nugent & McWillie, of counsel, also filed a separate brief,) for plaintiff in error.

Frank Johnston and M. Green, (Calhoon & Green, on the brief,) for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

McCORMICK, Circuit Judge. On the 7th August, 1890, Mrs. Florence C. Dupre, the defendant in error, accompanied by her husband, got on the Meridian train of the Alabama & Vicksburg Railway, a part of the Cincinnati, New Orleans & Texas Pacific Railway Company's system, at Jackson, Miss., to go to Akron, Ala. They first entered the day coach, but as Mrs. Dupre was enceinte, about two months advanced, and had experienced one miscarriage, they concluded to take the sleeper, and went back to it, where they were met by the porter, seated, and told they would have to wait until the conductor came around. This was about 5:30 P. M., and the train on schedule time would arrive at Akron about 1:30 A. M. following.

On May 27, 1891, to the June term of the circuit court for the state of Mississippi, Hinds county, first district of the circuit court, Mrs. Dupre, the defendant in error, brought her action against the plaintiff in error, the Mann Boudoir Car Company, alleging that, on the occasion mentioned, she, accompanied by her husband, went into the sleeping car, and asked for a lower berth in said sleeper. That then and there the conductor sold her a lower berth for two dollars, which her husband paid the conductor, and the conductor assigned her a particular berth as the one designated and selected for her, and shortly after, the berth, by the conductor's direction, was properly arranged so that she could retire, which she accordingly did, it having been explained to the conductor that she was unwell and deli-

cate, as a reason why it was desired that her berth should be made down at an early hour. That when the train reached Meridian, about 11 o'clock that night, the conductor came to her compartment, and informed her and her husband that she must vacate and leave her berth at once, as it, with other berths, were needed for certain commercial travelers who came aboard the train at Meridian. It was protested that the conductor had no right to eject her, but he in a rude and offensive manner ordered her to leave the berth, and insultingly pulled back the curtain that draped her berth, and declared in a loud tone that she must get out. That the conductor insultingly refused to open the forward sleeper that they might walk through it to the day coach. That he curtly refused to permit the porter to carry her hand baggage to the day coach, and declined to assist in removing her hand baggage from the sleeper, or help her to descend from the platform. Thereupon, protesting against this denial of her legal and just rights, she, with her husband's assistance, descended from the platform, and with great pain and discomfort walked, greatly hurried and agitated, to the day coach, about the moment the train was getting into motion, and sat up during the remainder of the night. That she had suffered alarm, agitation, and distress, from the offensive manner, language, and conduct of the conductor, which produced or contributed greatly to produce an illness of a serious and perilous character, from which she suffered great bodily pain and apprehension and distress of mind, for all of which she claims damages in the sum of $10,000. To which action the sleeping-car company, on June 1, 1891, pleaded not guilty; and the same day, by proper petition and bond, moved the case to the United States circuit court for the southern district of Mississippi. The testimony of the defendant in error and of her husband tended to prove all the material allegations of the declaration, and the testimony of a Dr. Hunter, who attended her as a physician, tended to prove that her fright, agitation, distress, and discomfort that night, if as she and her husband represented it to have been, would tend to produce, and might have caused, the miscarriage which she suffered on the 31st of August, 1890. For the defense there was proof tending to show that by a regulation of the railroad company the whole compartment in which was the berth occupied by Mrs. Dupre was reserved from sale by the conductor until after the train should pass Meridian, when, if the berths in it were not sold at Meridian, or taken by persons getting on there, the conductor could dispose of them, but not before; that this regulation was fully explained to the husband of Mrs. Dupre in her presence, and they were told they could occupy it until the train reached Meridian, but would have to surrender it then if it had been sold at Meridian; that some time before reaching Meridian the conductor learned that the compartment had been sold at Meridian, and told the husband of Mrs. Dupre that she would have to take the upper berth in another compartment, for which the conductor had given said husband a berth check when he sold him a berth; that said husband then became violent, and said they would not leave the berth Mrs. Dupre was in; that the conductor had no lower berth which he could let her have, except the lower

berth in the buffet where he slept, and which immediately adjoined the compartment where Mrs. Dupre was, and was every way as comfortable and sumptuous, which he offered to let her occupy as far as she was going, and to give her the exclusive use of the buffet compartment to Akron, which she indignantly refused, because the negro porter ordinarily sat in the buffet, and slept in the upper berth in it. There was proof also tending to show that the regulation reserving the compartment for passengers taking the train at Meridian was a reasonable one, and that on this day, 7th August, 1890, the lower berths in said compartment were taken at Meridian by parties who took the train at that point. The berth check delivered to Mrs. Dupre's husband was attached by him to his deposition offered on the trial by her, and it shows that it designates an upper berth in another compartment. There was proof tending to show that Mrs. Dupre's husband was a very excitable man, and when he was informed that compartment B, in which his wife then was, had been taken at Meridian, and she would have to vacate it, his temper rose at once to fury, and that the fright, anxiety, and distress of mind suffered by Mrs. Dupre was excited and caused by her husband's violent language and conduct; that his rage was such as rendered him deaf to all explanation, and made him reject with scorn every offer of accommodation or assistance. The proof also tended to show that for 16 or 18 days Mrs. Dupre suffered with uterine pains without calling in medical aid, and that timely, skillful medical aid might have relieved them, and prevented the miscarriage. The plaintiff in error, defendant below, requested the circuit court to give the jury what it calls "Instruction No. 1," "Instruction No. 2," and "Instruction No. 3." Instruction No. 1 has three sections, No. 2 has only one section, No. 3 has six sections, and altogether they fill seven closely printed octavo pages in the printed record, all of which the judge refused to give, and gave the jury a charge in writing, excepted to only "in so far as it failed to include the charges asked by defendant, and refused." There was a verdict and judgment for the plaintiff, motion for new trial refused, and the defendant prosecuted and perfected this writ of error, setting out separately and particularly 13 errors in its assignment of errors.

The distinguished counsel who appeared for the plaintiff in error in this court, and made an oral argument, has in his printed brief urged four propositions:

"(1) It was error in the lower court to admit the testimony of the plaintiff and her husband, contradicting the declarations appearing on the face of the berth check as to the berth bought by the plaintiff, and in refusing our instruction to return a verdict for the defendant.

"(2) The circuit court erred in refusing our request to exclude from the consideration of the jury, as a basis of damages, the uterine pains and miscarriage suffered by the plaintiff after she left the car of the defendant at Meridian.

"(3) The circuit court erred in refusing to give section 4 of instruction No. 3 asked for by the defendant company.

"(4) The circuit court erred in refusing to give the instruction asked by the defendant bearing on the contributive negligence of the plaintiff."

Only the first of these propositions relates to errors which were properly saved under the well-settled rules announced by the supreme

court. The others all relate to errors in refusing parts of instructions asked in the aggregate, which in our opinion should not have been given in the aggregate, on account of objectionable matter therein, and were therefore rightly refused. Railroad Co. v. Horst, 93 U. S. 291; Harvey v. Tyler, 2 Wall. 339, and many other cases. Sounding only this note of caution, we may waive this informality, and consider the four propositions urged by plaintiff in error in this court. The first of these propositions rests on the theory that the berth check furnished a passenger by the conductor of a sleeping car, so far as it designates a particular berth as the one assigned to the passenger, becomes, as soon as it is furnished to the passenger, and received without immediate objection, a written contract as to that subject-matter, and its terms cannot be varied or contradicted by parol testimony. It is common knowledge that in many cases, possibly in the majority of cases where the carriage begins at a terminal point, or in any large city or considerable town, the passenger receives a "sleeper" ticket at a ticket office, and surrenders this ticket on entering the "sleeper," and receives a berth check from the conductor of the sleeping car. Until only a very few years ago this berth check was taken up by the porter when he first prepared the berth to be occupied as a bed. It was then, manifestly, only a check on the employes of the company,—not the evidence during the trip or afterwards of a contract between the company and the passenger; for after it was surrendered there was nothing on it to identify it as the berth right of any individual passenger. We believe it is safe to assume that the great majority of travelers of middle age or past, who are familiar with the former practice in this respect, have not noted the change, and, of those who have noted it, few, if any, have understood that the company's purpose in discontinuing the practice of having these berth checks taken up by the porter, at the very beginning often of a several days' journey, was to convert them into a written contract, which should show beyond contradiction what berth the passenger had been allowed to select for the customary fare he had paid. An expert railroad officer, employe, or traveler may be familiar enough with the current forms of these berth checks to decipher, on a blue or other colored ground, by the lights in a sleeping car at night, the marks of a lead pencil, made by the average conductor, standing in a car on a moving train on an average track in this circuit, so as safely to accept it, as the only admissible evidence to him and to the courts, as to the berth he was allowed to select and did select, and had delivered to him, but, speaking from an average experience and observation, it is safe to say that if it is, or ever becomes, the sound and settled rule of law that such berth checks as are now commonly issued shall be conclusive evidence as to the berth contracted for, whenever any question arises between the company and the passenger as to that matter, the rule will put one of the parties largely and in many instances wholly in the power of the other. Why should it be the rule? What are the reasons which justify the rule that some contracts shall be proved only by a memorandum in writing? Or the broader rule that requires, when parties do reduce their contracts to writing, the writing

shall be conclusive between them as to all it clearly expresses that is material to the contract? The most accurate thinkers are the first to note, and the most careful to guard against, the liability of the mind to be misled by the use of terms and the application of analogies. Whatever answer may be correctly given to the last question, it can hardly be such as to draw the berth check in question, within the meaning of the rule, and give to it that conclusive force claimed for it by the plaintiff in error. A transportation ticket from Boston to Chicago is issued for use on several different lines of road, or on different divisions or conductors' runs on the same road, to be evidence to these several numerous conductors, and to be used necessarily more than one day before being regularly exhausted by complete execution of the contract to carry, and yet, in a case arising on such a contract as a ticket for that carriage evidenced, the United States supreme court say:

"While it may be admitted, as a general rule, that the contract between the passenger and the railroad company is made up of the ticket which he purchases, and the rules and regulations of the road, yet it does not follow that parol evidence of what was said between the passenger and the ticket seller from which he purchased his ticket at the time of such purchase is inadmissible, as going to make up the contract of carriage, and forming a part of it. In the first place, passengers on railroad trains are not presumed to know the rules and regulations which are made for the guidance of the conductors and of the employes of railroad companies, as to the internal affairs of the company, nor are they required to know them." Railroad Co. v. Winter's Adm'r, 143 U. S. 60, 12 Sup. Ct. Rep. 356.

No more are they presumed to know the meaning of the detached words, abbreviations, figures, punches, blanks, and pencil marks, that can only be correctly read or interpreted by the rules and regulations which are made for the guidance of the conductors and of the employes of sleeping-car companies as to the affairs of the company, nor are they required to know them. The conductor of the sleeping car does not need this berth check to evidence to him anything expressed on it, with which the passenger has any concern. The conductor is the initial party to it, and remains constantly present with the other party, until its every function which affects the passenger should be completely discharged. The parties necessarily remain together during the whole period of the life of the berth check, and as, necessarily, not as much as a full legal day can intervene between the furnishing of it and that complete delivery of the berth itself, which surely should be as conclusive as the mystic symbols on the berth check. Each car has its conductor and porter that go with it through its whole trip, and it can receive only that limited number of passengers which an experienced conductor can readily identify and keep distinguished in his mind. In our opinion there is no necessity of the sleeping-car service, or sufficient reason shown or believed by us to exist, for giving the berth check the conclusive force as evidence insisted on by the plaintiff in error. Its first proposition therefore cannot be sustained.

The plaintiff in error's second proposition rests on the theory that, unless it was apparent to a casual observer that Mrs. Dupre was enceinte, or that fact was made known to the servants of the com-

pany, she could not recover damages for her subsequent miscarriage, though the jury might believe from the evidence the miscarriage was proximately caused by the unlawful conduct of the company's servants in expelling her from the train. This theory, and the requested charge embodying it, would require every pregnant woman to refrain from travel; to take all the risks of the negligence of public carriers; or to proclaim her condition to the servants of the carriers. We are not willing to sanction by our authority a rule that would so shock the delicacy, dignity, and sense of justice of our "honorable women not a few." The subject called for careful direction of the jury in order to exclude damages too remote; that is, such as were suffered from the action of some intervening cause, or contributed to by the negligence of the plaintiff below. Where, however, the proof satisfactorily shows that the misconduct of the carrier's servant to her while she was a passenger in the carrier's car was the proximate cause of such an injury to a married woman, the carrier should not be held exempt from liability on account of the fact that her condition was unknown to the servants of the company. We therefore do not sustain the second proposition of the plaintiff in error.

The fourth proposition of plaintiff in error we cannot sustain because the requested charge to which it refers, if we have guessed correctly, (we are left by the proposition to guess,)—section 3 of instruction 3,—is too broad to have been given as requested. It relates to a feature of the case calling for a proper charge,—one not embraced in the court's charge,—and if it had been properly limited and freed from that coloring which the zeal of advocacy often gives to requested charges, should have been given.

The third proposition must be sustained. Section 4 of instruction No. 3, asked by the company, and refused, is as follows:

"If you find from the evidence that, by the standing order of the railroad company, all of the berths in 'Letter B' were reserved for Meridian passengers, and that the conductor of the defendant erroneously sold the lower berth in 'Letter B' to the plaintiff; and you further find that, within a reasonable time before reaching Meridian, he notified the plaintiff of his error, and at the same time informed her that the berth was reserved for, and had been taken by, passengers at Meridian; and you further find that the conductor offered the plaintiff the occupation of another berth in the car, equal to the berth in 'Letter B' in accommodation; and you further find that the plaintiff refused to accept this other berth, and thereupon left the car without being compelled to do so by the conductor,—then I instruct you that the defendant was not guilty of such a breach of the contract with the plaintiff as would entitle the plaintiff to recover damages on that account."

This charge we consider substantially sound, and applicable to the issues of fact and the evidence in the case, and either it should have been given as requested, or the judge of the circuit court should have charged the jury on the point, and substantially to the effect of this request. For the error in refusing this requested charge, and in failing to charge on the point indicated by this request, the judgment of the lower court must be reversed.

It is therefore ordered that the judgment of the circuit court be reversed, and the cause remanded, with directions to that court to award a new trial.