# FLORENCE T. DALZELL, Appellant, v. DEAN HOTEL COMPANY, Respondent.

### Kansas City Court of Appeals, April 3, 1916.

1. **INNKEEPERS: Relation to Guests: Care Required: Eviction of Guest: Malice.** Plaintiff and her husband became guests at defendant's hotel and occupied a room. Next morning her husband, leaving his wife indisposed and in bed, went to a convention a short distance from the hotel. Another guest paid his bill and left and, by mistake, the clerk credited it to plaintiff's room and bill. Thereafter the hotel management notified plaintiff that she must vacate the room. She explained to them that she was sick, that her husband was at the convention only a short distance away, that there was a mistake and they should investigate. Her explanation was not accepted nor was an investigation made, nor was there any delay to ascertain whether her husband had gone, but she was required to leave under circumstances which subjected her to humiliation and insult. *Held*, that this, together with the failure to investigate, was evidence sufficient to justify the submission of the question of malice to the jury, and that the court was not warranted in taking that question away from them.

2. —————: —————: —————. The hotel keeper, while not an insurer of the safety, quiet, comfort and repose of his guest, nevertheless owes the guest the exercise of a very high degree of care in that regard. The duty and obligation resting upon him are similar to those of a common carrier toward its passengers.

3. —————: —————: —————: —————: —————: **Jury Question.** No ill will or hatred or personal spite is necessary to create legal malice. The intentional doing of a wrongful act without just cause or excuse, "has been a definition of legal malice for many years." In applying this definition, however, a distinction should be made between things that are wrong in themselves and things that are apparently proper. But where defendant was informed of the true state of affairs and that there was a mistake on its part, and thereafter failed to make any investigation or to wait a little while to ascertain the truth, the question of whether there was legal malice was for the jury, since malice may be presumed from gross and culpable negligence in omitting to make suitable and reasonable inquiries.

4. ———: ———: ———: ———: ———: Elements of
Damage. Suspense, anxiety, mental distress or pain of mind,
when not connected in any way with bodily injury is not the
subject of damages unless the wrong done is accompanied by
circumstances of malice, oppression, insult or inhumanity.
But in this case plaintiff, while receiving no assault upon her
person, was caused, while ill, to leave her bed and go to the
lobby and upon the streets of a strange city under circumstance
which greatly excited and wrought up her nervous system and
increased her indisposition, and it cannot be said, as a matter
of law, that this resulted in no physical injury to her. It is
not the case of a woman suffering mere mental anxiety, sus-
pense and nothing more.

5. ———: ———: ———. After a guest has been assigned
to a room, he is entitled to the exclusive use thereof subject
only to the innkeeper's right of access thereto at proper times
and for such reasonable purposes as are necessary in the gen-
eral conduct of the hotel, or to attend to the needs of the
guest or to meet an emergency.

6. ———: ———: ———: ———. Where a guest, a delicate
and refined woman, after being twice requested to get out of
her room and then told by the clerk that she had to get out,
and the hotel management brought another guest to the room
showing that the command would be enforced, it was not nec-
essary for her to stand her ground and be put out bodily be-
fore she could claim to be dispossessed of the room.

Appeal from Jackson Circuit Court.—*Hon. C. A. Bur-
ney,* Judge.

Reversed and remanded.

*Park & Brown* for appellant.

*Cowherd, Ingraham, Durham & Morse* and *Hale
Houts* for respondent.

TRIMBLE, J.—Defendant operates the Hotel Bal-
timore in Kansas City. Plaintiff, with her husband,
was a guest and had a room in said hotel. During the
temporary absence of her husband from the hotel,
plaintiff was required by defendant's servants to va-
cate and give up the room. She brought this suit for
damages, alleging that defendant unlawfully, wilfully

and maliciously ejected her from said room causing her to suffer great pain, chagrin, humiliation, mortification, disgrace, and anguish of both body and mind; that her nervous system was greatly shocked, by which she was rendered extremely nervous and sick, and suffered a miscarriage as a direct result thereof. Originally, her petition prayed for $25,000 actual and $25,000 punitive damages, but during the trial it was amended so as to ask for $2500 compensatory and $5000 exemplary damages.

The answer was a general denial.

In addition to the facts and circumstances relating to her being compelled to give up the room, plaintiff offered to prove that, at the time, she was in a state of pregnancy of about six weeks' advancement; that up to the time of her eviction she had been in normal health; that immediately after leaving the room in the hotel her physical condition became highly nervous and excited; that she remained in that condition all that afternoon, felt sick and faint and medicine was given to relieve her; that she left Kansas City that night for her home in St. Louis arriving there the next morning; that her condition grew worse and her physician was called; that she continued in a very serious condition, suffering from nervous prostration, with symptoms of extreme nervousness, tremor and crying, eating nothing and with her temperature at ninety-nine and her pulse 110, and in a general state of emotional agitation; that seven days after her arrival home she suffered a miscarriage and was in a very serious condition for some time thereafter. Plaintiff offered to prove her condition, up to the time she left Kansas City, by herself and Mr. and Mrs. Dunn, friends living in Kansas City to whose house she went after leaving the hotel. Her condition after her arrival in St. Louis she offered to prove by herself and her doctor, a physician and surgeon of that city with fourteen years ex-

perience. Plaintiff also offered to prove by this physician and by two physicians of Kansas City, both of long experience, one now president of the Jackson county Medical Society and the other a former Secretary of the State Board of Health, that plaintiff's condition was one which could be produced by emotional shock, and that emotional shock will produce miscarriage with a woman in normal condition; that assuming the circumstances attending and following her eviction from the room to be true, which were embodied in hypothetical questions, the miscarriage might or could have been produced by and be the direct result of the mental and nervous shock received by the treatment accorded her.

All of the foregoing offers of testimony on the part of plaintiff were excluded by the trial court, except possibly plaintiff's statement, made at the outset, that up to the time of the trouble at the hotel she had been in good health. The court also refused plaintiff's instructions submitting the question of actual and punitive damages, and, at the request of defendant, instructed the jury that if they found for plaintiff they could allow her only nominal damages.

The jury returned a verdict for plaintiff in the sum of $5 and plaintiff has appealed.

The verdict shows that the jury accepted plaintiff's version of the affair at the hotel, and in view of this fact and the further fact that the trial court excluded the testimony offered as hereinabove stated, we must accept plaintiff's testimony as true and give to it the benefit of all the inferences which can be reasonably drawn therefrom. And a proper understanding of the case requires a statement of the facts somewhat in detail.

On Monday evening, October 16, 1911, Mr. and Mrs. Dalzell left St. Louis for Kansas City to attend a convention of the Knights of Pythias. They arrived

Dalzell v. Dean Hotel Co.

in Kansas City on the morning of October 17th. They went to the Baltimore Hotel where Mr. Dalzell registered and they were accepted as guests about eleven o'clock in the day, and were assigned to room 367 and given the key thereto. They occupied that room the remainder of the day and night of October 17th.

The next morning plaintiff, feeling indisposed, did not arise. About ten o'clock in the morning her husband left the room to attend the convention. Upon his departure plaintiff arose, locked the door, leaving the key in the door on the inside and returned to her bed.

About twenty or thirty minutes later there was a knock at the door. Plaintiff asked what was wanted, and the person at the door asked her how soon she would vacate the room. Plaintiff replied: "Vacate the room? What is the trouble? I am not supposed to vacate this room. My husband left me here and I am in bed sick. I don't know anything about vacating the room—there must be a mistake."

Thereupon the person who had knocked left the door and plaintiff remained resting in bed. About fifteen or twenty minutes later, plaintiff was again awakened by a knock at the door and she was asked the same question, when she was going to vacate the room. She was also told that another had been assigned to the room and they wanted to know how soon she was going to get out of it. She again told them it was a mistake and that they should look into it. The person at the door replied they didn't know anything about that; that plaintiff was to give up the room, and wanted to know how soon she would give it up. Plaintiff testified that she couldn't recall all she said.

Plaintiff, thinking that perhaps she had better get up and get dressed as there was some trouble, arose from her bed and went into the bathroom to take her bath. While in the tub the telephone in her room rang. She got out of the tub and went to answer it. The per-

Dalzell v. Dean Hotel Co.

son speaking over the telephone told her he was the clerk. He said the room had been checked out in the morning and was assigned to a gentleman who was waiting for it, and he wanted know how soon she would get out of the room. Plaintiff testified: ''I told him where he could reach Mr. Dalzell. I told him I was Mrs. Dalzell and he could find Mr. Dalzell over at the convention hall, and I knew positively that he didn't pay for that room without notifying me. He said the room had been paid out and the party had left—he paid for the room and said that the party would be out in fifteen minutes and I had to get out. I said, 'Are you positive?' He said 'Yes, I know my business.' And hung up the receiver on me.''

Plaintiff testified that she then tried to reach her husband over the telephone but could not find the number of the hall in the book; that she then tried to dress hurriedly to find her husband and to pack her clothes as she did not want to be thrown out of the room. Before she had finished dressing there was another rap at the door and plaintiff, being then dressed enough to go and open it, unlocked the door. Plaintiff then testified:

''I unlocked it, and there stood the boy with some baggage and a gentleman. I couldn't tell you how the boy was dressed, any more than as boys do—with cap with the number on it—I judged he was a bell boy—I know he was carrying a grip. He asked whether I was ready to vacate the room—I said yes I am through— I will be out in a few minutes, and the man says, 'I don't want the room until one o'clock, don't hurry.' I said I had nearly finished dressing, so I got my hat and coat and walked out. The boy came in and took my baggage and went down on the same elevator with me. He checked them and handed me the checks in the lobby. I went to a clerk standing in the hotel. I pounded (showing). 'I want to know why I was put

out of the room.' He turned from me and said he knew nothing about it and walked away. I said, 'I will find somebody that does.' I went out the door and walked as fast as I could to the Casino to find Mr. Dalzell, but in the meantime Mr. Dalzell had come back to the hotel. I hurried back to the hotel and just as I was coming in to this desk, the clerk said, Mr. Dalzell was then phoning, from the room I had vacated, to the clerk that had talked to me, that he had said he didn't know anything about it. The clerk said, 'Here is your wife now.' I took the telephone and said hello, and Mr. Dalzell came down stairs. There were quite a few people there, the convention being over, men came to the hotel. There were lots of people there. I was then very fainty, dizzy, sick, exhausted and nervous. There was conversation between Mr. Dalzell and the employees. After that we went to the Coates House, where we ate. After lunch, I went out to my friend, Mrs. Dunn's, where I stayed until train time that evening, nine something, I believe when we took the train home. I felt sickly, had to lie down. Mrs. Dunn got some asperin to quiet me. We arrived at St. Louis about eight o'clock the next morning. When I got home I felt very sick. I laid down and tried to rest. I was nervous and was up and down all that day, and the next day, and Wednesday I took down with a serious illness. On Thursday, called a physician, Dr. E. Morrish, who had been our family physician.''

Here plaintiff was asked as to her being pregnant. This was objected to as irrelevant, incompetent and immaterial. And defendant then interrogated plaintiff as follows:

''Q. You have told all about what happened here before the jury.

A. Yes, sir.

Q. There was no insulting language used? A. No, sir.

193 App. 25

Q. No discourteous treatment? A. Yes—over the telephone.

Q. You have detailed what that was? A. Yes, sir—over the telephone.

Q. You have told all that you consider discourteous. A. Yes, sir.''

After which the court sustained the objection to the question as to pregnancy? Plaintiff then offered the testimony of herself and her other witnesses hereinbefore stated as having been rejected by the court. All of which was excluded and plaintiff saved her exceptions.

After this was done, plaintiff was recalled and testified as follows:

''After leaving this room, I hurried over to Casino Hall; did not find Mr. Dalzell; came back to the Baltimore Hotel. The clerk was then talking over the telephone. He said, 'Here is your wife now.' Following that, my husband appeared in the lobby. He went to the clerk—the same one I had asked why I was put out of the room— and he demanded an explanation of why his wife was ejected from the room in his absence. The clerk said he didn't know, the same as he had told me. He referred him to another gentleman—rather stout and short. Yesterday I saw the stout gentleman that I am speaking of, the second man in the court room. My husband asked him the same question. He wanted to know why his wife was ejected from that room in his absence. He said, 'Now, Mr. Dalzell, don't get excited and we will try to find out what the trouble is.' Mr. Dalzell said, 'Well, I want to know. I have a right to know. When I left my wife here in the hotel, under your protection, I assumed as any man would, that she would be properly treated.' He went behind the counter and talked to some one there, came out and found another gentleman with gray hair, and a gray suit. I think I saw him there. He said the same thing

—he wanted to know why was his wife ejected from that room in his absence, that he had left her there under their protection. He said, 'Mr. Dalzell, I will investigate,' and· he went behind into the cashier's place and asked her, I suppose, because they got down some books and looked over them. He came from behind the ·cashier's desk with ·a book, he opened it and showed· us where Dalzell had a line scratched through it. He said he was assistant manager or manager and 'Mr. Dalzell, we have made a mistake, the girl has scratched the wrong name, we are very sorry,' and offered us a room on the parlor floor, if I can recollect aright—I· was excited. Mr. Dalzell said, 'No, I don't want any of your rooms, I want my bill, present me my bill, and I want to pay it and get out of here, if this is the way you treat a respectable woman.' He said, 'Mr. Dalzell, under these circumstances, I can't present you with a bill, won't you accept another room? We are very sorry that this should have occurred.' Mr. Dalzell said, 'No, I accept no rooms, I wouldn't leave my wife here another minute, after she has been thrown out of her room and left to roam around the lobby with a lot of strange men around subject to insult.' There were then many, many people around. They were all lined up, listening. The lobby was packed with people. They wouldn't give us a bill and naturally we couldn't pay any. Mr. Dalzell demanded one but we couldn't get it, so he took me over to the Coates House to get· a little bite to eat.''

Plaintiff here attempted to testify that when the first rap on the door was made she told him she was sick in bed and could not vacate. This was objected to ''because the witness has stated that she didn't say that—that she hadn't omitted anything.'' The objection was sustained.

The record, as brought to us, shows that she had testified that she told him she was sick, but we have

been unable to find where she said she hadn't omitted anything.

Plaintiff then attempted to testify that when the second time the rap was made at the door, she told the person she was sick in bed and could not vacate the room. This was also objected to ''because the witness stated when the second party rapped upon the door she was in the bath, and she said she didn't omit anything.'' The objection was sustained. The record, however, shows clearly that the witness had said she was in bed when the second rap came and that she had testified that she could not recall all that was said.

Plaintiff also attempted to testify that in her conversation over the telephone with the clerk she said something to him about being sick, and offered to prove that in her conversation over the telephone she told him she was sick and could not vacate. But the same objection was made and it was excluded.

Plaintiff then testified that when the last bell boy came with the guest and his grips, she said nothing to him about her grips. The boy asked her, was she ready to leave? She walked out of the room saying nothing to him about her grips. He picked them up, put them in the same elevator with her and carried them down stairs, checked them and handed her the checks.

Defendant's evidence shows that another guest by the name of Dalgren in room 267 paid his bill and left early that morning, and, the cashier, confusing the two names, by mistake credited the name of Dalzell in room 367 with such payment and marked the room as having been given up. Defendant's evidence is further to the effect that the office force, being under the impression that Mr. Dalzell had paid for and had given up the room, requested plaintiff to vacate it in order that it might be given to arriving guests; that she protested and the request was repeated and plaintiff finally gave up the room about noon.

Brown, one of the clerks, testified that the room being listed as vacant on their Departure Book, he assigned a gentleman to the room; that the bell boy reported the room still occupied, and he then telephoned to the room and a lady's voice answered. He says he told her the account had been paid; the cashier had informed him that "the party was leaving the room, had given it up. And I asked how long they wanted to retain it, and I was told that if the room had been paid for, that the lady didn't know it and that she would have to wait until her husband came to find out." He further testified that the lady told him "she wished to retain the room until she could locate her husband or until he came in." He says he told her that would be all right but that if they wanted "to keep the room over night or for any length of time it would be necessary for her husband to come to the desk and make arrangements with the clerk." He said he "notified the lady that the account had been paid and asked her when she was going to give up the room, when she expected to vacate." He denied that she told him she was sick. He further testified:

"I don't believe she said 'There must be a mistake.' She did not say it. She said her husband was out; she did not say where he was; she said nothing about being sick. I did not tell her she must vacate. I did not say, when she protested against leaving the room, 'I know my business' nor similar language."

He said he worked that day from seven in the morning to twelve-thirty and then from six to twelve in the evening; that the telephone conversation took place about eleven o'clock; that he sent only one guest, a man by the name of Darling, to plaintiff's room and, when the bell boy reported a lady occupying the room he immediately assigned Darling to another room. A witness for defendant, Sculley by name, testified that he was shown to a room, which the bell boy later iden-

tified as plaintiff's room. So there must have been two guests sent to her room. Sculley testified that when the bell boy rapped, a voice answered and said "Come in." That the boy opened the door but neither of them entered. He said the woman was standing in front of the mirror putting on her hat; that he apologized for the error in showing him to that door. He said "The woman then spoke up and said it was all right as she was leaving the room and the boy picked up her bag which was fully packed and went to the elevator with her. I never saw her after that." On cross-examination he said she was not anxious or excited so far as he could see. He would not say she made no objection to giving up the room, that his recollection was "she said she understood from her husband that she could remain in the room all day. I said I did not know anything about it as that was a matter for the office." He also said "The woman carried on no conversation with me." That "she was rather surprised that I came in there to take her room. From appearances she had no intention of leaving, except she was putting her hat on. From the way she spoke to me, I would not think she had any intention of permanently leaving the room."

The bell boy who took Sculley to the room also testified to facts tending to show that she was ready to go and went voluntarily. He did not remember which one of the clerks sent him to the room with Sculley.

Kleeburger, another clerk, testified that he came on duty at twelve o'clock. He testified to the trouble in the lobby, and that he ascertained, by looking on the cashier's book she had checked out room 367 instead of 267, and this was how the mistake had occurred. He also testified that Mr. Dalzell asked for his bill and insisted on paying it but that they refused to charge him anything and offered him a parlor bed room to fix matters up, which was declined. He had no recollec-

tion of sending anyone up to room 367, but learned that other people had been assigned to that room, two bell boys sent up, prior to twelve-thirty. They were undoubtedly sent up from the office. The key clerk or room clerk might send them up.

The evidence offered by plaintiff was excluded, and her instructions bearing upon actual and punitive damages were refused, on the theory that the evidence shows that plaintiff received no physical injury on account of the treatment accorded her and that there were no circumstances of wilfulness, malice, insult, or inhumanity connected with it.

Ever since the case of Trigg v. St. Louis etc. R. Co., 74 Mo. 147, it has been the rule in this State that suspense, anxiety, mental distress, or pain of mind, when not connected in any way with bodily injury, is not the subject of damages unless the wrong done is accompanied by circumstances of malice, insult or inhumanity. [Logan v. Hannibal etc. R. Co., 77 Mo. 663; Connell v. Western Union Tel. Co., 116 Mo. 34; Spohn v. Missouri Pacific Ry. Co., 116 Mo. 617; Strange v. Missouri Pacific R. Co., 61 Mo. App. 587; Snyder v. Wabash R. Co., 85 Mo. App. 495; Smith v. St. Louis etc. R. Co., 127 Mo. App. 53; Glover v. Atchison etc. R. Co., 129 Mo. App. 563; Crutcher v. The Big Four, 132 Mo. App. 311.] There is no doubt but that such is the rule. The question, therefore, before us is whether or not the evidence, accepted in the light most favorable to plaintiff, is so devoid of any showing of physical injury to her or so free from any circumstances of malice, insult, inhumanity, or of offensive and humiliating conduct, as to enable the trial court to say so as a matter of law and take the decision of such matters away from the jury. Our problem, then, is not so much to ascertain and set forth the rule of law as it is to apply the law to the facts and see whether they are such as to bring the case within the rule stated.

In approaching this problem it is well for us to get a clear view of the situation and status of the two parties and the relation they sustained toward each other. The hotel keeper, while not an insurer of the safety, quiet, comfort, and repose of his guest, nevertheless owed her the exercise of a very high degree of care in that regard. An innkeeper is in duty bound to regulate and conduct the business of his house with a due regard to the peace, quiet, comfort and repose of his guests. The duty and obligation resting upon him to protect his guests from annoyance, discomfort, insult and injury are similar to those of a common carrier toward its passengers. [Commonwealth v. Power, 7 Met. (Mass.) 596, l. c. 601.] "The relation existing between an innkeeper and his guest is much like that existing between a common carrier and its passenger, and, while not an insurer of the personal safety of the guest, the proprietor of the hotel is held, and ought to be held, to the exercise of a very high degree of care for the protection of his guests against the negligent acts of servants employed therein." [Trulock v. Willey, 187 Fed. 956, l. c. 958.] "By the implied contract between a hotel keeper and his guest, the former undertakes more than merely to furnish the latter with suitable food and lodging. There is implied on his part the further consideration that the guest shall be treated with due consideration for his safety and comfort." . . . "His undertaking is not that he personally shall treat them with due consideration, but that they shall be so treated while inmates of the hotel as guests; and if they be not thus treated, there is a breach of the implied contract, whether the lack of such treatment is the result of some act or omission of the proprietor himself or of his servant or servants. [Clancy v. Barker, 115 Am. St. Rep. 559, l. c. 563-4." The guest has a right to insist upon respectful and decent treatment at the hands of the hotel keeper and his servants and

employees; and this implies the obligation on the part of the hotel keeper and his servants and employees that they will not abuse or insult the guests, or indulge in any conduct or speech that may unnecessarily bring upon the guest physical discomfort, distress of mind, or imperil the guest's safety. [Lehman v. Hines, 88 Kan. 58, 1. c. 65.] Defendant certainly owed a duty to plaintiff in respect of her convenience, privacy, safety and comfort while she was a guest of the hotel. [De-Wolf v. Ford, 193 N. Y. 397, 1. c. 401.] After a guest has been assigned to a room, he is entitled to the exclusive use thereof subject only to the innkeeper's right of access thereto at proper times and for such reasonable purposes as are necessary in the general conduct of the hotel or to attend to the needs of the guest, or to meet an emergency. [DeWolf v. Ford, supra, 1. c. 403.] One of the things which a guest for hire at a public inn has the right to insist upon is respectful and decent treatment at the hands of the innkeeper and his servants. This is an essential part of the contract whether it is express or implied. This right of the guest necessarily implies an obligation on the part of the innkeeper that neither he nor his servants will abuse or insult the guest, or indulge in any conduct or speech that may unnecessarily bring upon him physical discomfort or distress of mind. [DeWolf v. Ford, supra, 1. c. 404.]

With this somewhat general statement of the rules governing the relation of innkeeper and guest, what was the situation of the respective parties herein? The defendant was an innkeeper. The plaintiff was its guest—a lady in a strange city, in bed on account of a slight indisposition, possibly the morning sickness of a pregnant woman. Her husband is away temporarily. He has, for a short time, left her in the privacy of her own room and entrusted her to the care and protection of the hotel. The hotel keeper knocks at her door and

asks her how soon she will vacate the room. She tells him there is a mistake, she is not to give up the room; that her husband has left her there and she is in bed sick. No investigation is made to see whether a mistake has been made or not. No consideration whatever is given to the fact that, *if* she has a *husband* and he has gone away for a short time leaving her in bed sick, it would indeed be strange behavior in him to pay his bill and give up the room without saying anything to his wife about it. But, without investigation and without considering the statements made by the guest, the hotel keeper again sends a servant to her door asking her when she is going to vacate; telling her that another guest has been assigned to the room and they want to know how soon she is going to get out of it. Again, she tells them it is a mistake; that they should look into it; that she is sick, etc. The reply is that they don't know anything about that; that she *"was* to *give up the room"* and again the question is asked how soon she would give it up. Again no investigation is made. to see whether she is telling the truth, nor whether there is a mistake, although she tells them there is, and suggests to them their duty of making an investigation. Her husband is not far away. He is within easy reach of the hotel. She tells them where he can be found. If she is telling the truth, he would return shortly. If her statement that he was her husband and had not permanently left the hotel, was not believed by the hotel authorities, only a *little* investigation and a *small* lapse of time would have settled the matter and demonstrated whether she was telling the truth or not. But nothing of the kind is done. The guest, thinking she had better get up and get dressed as there was some trouble, arose and began taking her bath. While thus engaged, the clerk, no mere under servant this time, but the one in command having power to speak with authority, calls into her room over

the telephone and announces to her that he is the clerk. He tells her the room was checked out in the morning—i. e. the one who had occupied it had paid for it and had given it up; that the room had been assigned to a gentleman who was waiting for it; and, how soon was she going to get out of the room? Again plaintiff tells him she is Mrs. Dalzell; that her husband is Mr. Dalzell; that he is over at the hall; that she knows positively that he did not pay for the room without notifying her. Is any investigation made to see whether she is telling the truth? Any examination to see whether a mistake had been made? None whatever, except the comparison of the number 367 on the Departure Book with the number 367 on the cash book, which the clerk says he made before calling over the telephone. But this was no *investigation*. It was merely comparing the two numbers; and the mistake was made in putting 367 on the Departure Book, and confusing the name "Dalgren" with "Dalzell." There was no investigation to see if a mistake was not made in putting this number on the book. But after plaintiff again tells the clerk the situation, no investigation whatever is made. Nor is plaintiff's word accepted in the matter as having any weight whatever. The clerk replied to her that the room had been paid out *and the party had left*—"he paid for the room and said *the party would be out in fifteen minutes*" and closed by saying plaintiff *"had to get out."* And when plaintiff desired to talk the matter over further with him, the clerk replied, "I know my business" and closed all further discussion by hanging up the receiver. The guest then tries to reach her husband over the telephone and not being able to find the number, abandons the attempt and commences to dress hurriedly in order to go find him. Before she is fully dressed, though far enough along not to be in dishabille, there is another knock at the door, and upon her opening it, there stood

a bellboy with another guest to be put in the room, and he asks her if she is ready to vacate. She steps out and the boy takes her grips out and down the elevator The evidence of Sculley, the incoming guest, shows that he understood there was some controversy between her and the office as to her being required to give up the room, as he says, in his evidence, that he said: "I did not know anything about it as that was a matter for the office." He says she did not seem anxious or excited but admits that she carried on no conversation with him. What was the use for her to maintain a controversy with the bell boy and a guest, when the one in authority had told her to get out? Can any one say there were no circumstances of humiliation, insult, disgrace, oppression, or reckless disregard of the lady's rights in thus, after telling her she had to get out, sending a male guest to her door who would know she was leaving the room under orders from the management, and that she was attempting to assert a right to the room which the hotel was refusing to recognize?

It is urged that she left the room voluntarily; that her room was not entered until she had stepped out. But, after being twice requested to get out and then told by the clerk that she had to get out, and when another guest appeared ready to be given the room, showing to her the command would be enforced, was it necessary for a delicate and refined woman to stand her ground and be put out bodily, before she could claim to be dispossessed of the room? We think not. She was entitled not only to the actual, physical, exclusive possession of the room, but also to the undisturbed and peaceable possession thereof in serenity and quiet, subject only to the exceptions hereinbefore noted. And her deprivation thereof was a trespass upon her rights.

Dalzell v. Dean Hotel Co.

After getting out of the room she went to the office and endeavored there to find out why she had been put out of it. Any woman of intelligence and refined sensibilities would be keenly alive to the fact that she was being placed in the position of a woman who was insisting upon staying in a room longer than the man who had occupied it with her had paid for, and that such man after paying his bill had left her. Her story that he was her husband had not been accepted. If her contention was true, she was entitled to all the consideration which could be shown to a good and virtuous woman. If untrue, then she was not a good woman and the best way to treat her would be with silence and avoid any conversation with her. Was the treatment accorded her considerate and regardful of her rights, *if,* perchance, her story was true? Her inquiry of one of the clerks merely elicited the cold rejoinder that he knew nothing about it, and he walked away. Under these circumstances she did the only thing left for her to do—she sought the protection of her husband. She went to the hall but not finding him, she returned to the hotel lobby thinking perhaps he had returned. She was correct in this. He had returned, and was telephoning to the clerk from their former rooms. As she walked up to the desk the clerk said to her husband over the telephone, ''Here is your wife now.'' She was ''then very dizzy, sick, exhausted and nervous.'' She was indisposed and remained in bed on that account. She was subjected to the hardship of arising and, under the exciting and humiliating circumstances, going to hunt her husband after all her protestations had been of no avail. Her illness continued, manifesting symptoms of extreme nervousness and profound emotional shock, finally resulting in a miscarriage, which three physicians say could be caused thereby.

Under all these circumstances was plaintiff entitled to have the question of her actual damages submitted to the jury?

Defendant's insistence that plaintiff received no *bodily injury* arises, we think, from an ambiguous use of the term "bodily injury." Certainly no one struck her or made an assault upon her, nor did she receive a blow or wound upon the outside of her person. But she was ill, and notwithstanding this fact, she was caused to leave her bed and room and go to the lobby and upon the streets of a strange city under circumstances which greatly excited and wrought up her nervous system and increased her indisposition. Can it be said, as matter of *law,* that the hardship of getting out of bed and going to hunt her husband, under the exciting and humiliating circumstances of this case, and while indisposed, resulted in no *physical injury* to her? It is not a case of a woman suffering mere mental, anxiety, suspense and anguish of mind and nothing more. In the Trigg case that was all of the plaintiff's suffering. At page 153 the court say, "There is no evidence that, as a consequence of the defendant's negligence, the plaintiff was subject to any physical hardship." And so with the other cases cited above. There were no untoward physical conditions present at the time and aggravated by the occurrence. In the case of Hickey v. Welch, 91 Mo. App. 4, l. c. 12, the court says there was abundant evidence to prove that plaintiff's nervousness or rather specific nervous disease was due with reasonable certainty to the shock she received from defendant's conduct, and that such disease was unquestionably a physical injury. In Bouillon v. Laclede Gas Light Company, 148 Mo. App. 462, the plaintiff was sick in bed and her sickness was aggravated by a trespasser upon the peace and quiet of her home, and although the disturbance was not directed to her personally, yet she was allowed to recover, and the

aggravation of her sickness was held to be a physical injury. It is true that in these cases the conduct complained of was grossly violent and threatening. But because plaintiff was not subjected to open violence or addressed with gross or profane language, and did not meet with such extreme treatment as shown in these cases, is no reason for saying she shall not have an opportunity for redress of the wrongs she did suffer. Her story that it was her husband who was with her and that he would not pay for and surrender the room with her sick in bed in it, was not accepted. And the statement to her that the man had paid and left saying "the party would be out in fifteen minutes" could have but one meaning to it, namely, that she was not telling the truth and that the occupant of the room with her was not her husband. This and the ignoring of her inquiries in the lobby showed clearly what they thought she was. The cold, calm, steely politeness of language carrying such an intimation was as insulting to a tender and sensitive woman and would be almost as hard to bear as if the charge were more openly made.

Continuing, however, upon the subject of whether plaintiff received a physical injury or not, the case of Mann Boudoir Car Co. v. Dupre, 54 Fed. 646, was where a pregnant woman was required to leave a berth in a sleeping car and "suffered alarm, agitation and distress from the offensive language, manner and conduct of the conductor which produced or contributed greatly to produce an illness of a serious and perilous character." Her physician testified that her fright, agitation, distress and discomfort that night, if as represented, would tend to produce and might have caused her miscarriage. The court held that evidence of her subsequent miscarriage was admissible and she could recover therefor if the jury believed it was proximately caused by the defendant's unlaw-

ful conduct in expelling her from the train. And this too even though the fact of plaintiff's pregnancy was not known to defendant's servants.

By limiting the plaintiff to merely nominal damages, the court declared as a matter of law, that plaintiff suffered nothing but pain of mind and mental distress, when there is evidence tending to show that she was suffering physically and while in this condition was required to leave her room and go in search of her husband under circumstances creating great nervousness and emotional shock. Such ruling overlooks the fact that there was physical suffering and physical hardship involved, and that they in connection with the emotional or nervous shock then and there aggravated plaintiff's illness which continued to grow worse until a miscarrage occurred. It is also an assertion that reasonable men could not differ upon the question of whether defendant's treatment of plaintiff contained any elements from which could be inferred either wilfulness, legal malice, insult, inhumanity, or offensive or humiliating conduct.

And this brings us to the question of wilfulness and malice.

The malice here dealt with is not actual malice. No ill will or hatred or personal spite is necessary to create legal malice. "The intentional doing of a wrongful act without just cause or excuse" has been a definition of legal malice for many years. [Peak v. Taubman, 251 Mo. 390, 1. c. 425; McNamara v. St. Louis Transit Co., 182 Mo. 676; Goetz v. Ambs, 27 Mo. 28.]

However, in using this definition, a distinction should be made between things that are wrong in themselves and things that are apparently proper. And it is urged that in this case the requirement that plaintiff give up a room which has been paid for and surrendered, was apparently right in itself and, therefore, defendant did not know it was doing wrong.

Well, it would seem that that is a question for the jury to pass upon.

In Stubbs v. Mulholland, 168 Mo. 47, l. c. 77, it is said malice may be presumed "from gross and culpable negligence in omitting to make suitable and reasonable inquiries."

Defendant was told several times that plaintiff was sick; that she was Mr. Dalzell's wife; that she knew positively he had not given up the room; that he was not far away; that they had made a mistake, and that they had better look into it.

Did defendant's servants know that *if* she was a wife, and *if* she was sick and the room had not been, given up, they would be doing her a wrong to insist upon her getting out? As said before, a *little* investigation and a *small* delay of further time would have solved the question. *But this was not done,* and from the fact that no investigation was made or delay allowed, legal malice may be inferred. To go on and insist upon plaintiff getting out, without taking the trouble to make the slight investigation necessary to ascertain the truth of her protestations and claims, was in total disregard of her rights if, perchance, it should turn out that she was right and they were wrong. The room clerk said that it "quite frequently happens" that a mistake is made in putting the wrong number on the Departure Book or in giving the guest a wrong number, yet all he did was to compare the number on the Departure Book with that on the Register. He made no effort to discover whether or not the number 367 on the Departure Book was the correct number to be placed there, although the protestations of plaintiff were sufficient to warn him that, if a mistake had been made, there was where it was.

It would seem that not only was there evidence of a reckless disregard of plaintiff's rights, but also that such disregard was intentional since it was done after

being thrice told by plaintiff that a mistake had been made and also that they should investigate the matter. In addition to this, there was evidence tending to show that the treatment accorded plaintiff was such as to embarass, humiliate and insult her. All this was sufficient to make the question of malice one for the jury to determine and not for the court to decide as matter of law.

The judgment is reversed and the cause is remanded. The other judges concur.