JENNIE WEISSMAN, Appellant, v. ROLLA WELLS, Receiver of UNITED RAILWAYS COMPANY OF ST. LOUIS.

Division One, December 19, 1924.

1. **PHYSICIAN: Competency as Witness: Knowledge Derived from Treating Patient: Waiver of Privilege.** A plaintiff who calls some of her chosen physicians to testify concerning her physical condition and thereby lifts the veil of secrecy which the statute permits her to place on their knowledge derived from treating her, waives her right to object to the testimony of other physicians who have treated her for the same malady. Plaintiff sued for injuries received in a street car collision, and claimed the collision caused hysteria and coincident therewith inability to use her voice. She had numerous hysterical attacks, or hysteria with the attendant loss of voice, and seven physicians treated her between the time of the accident and the trial. She testified that before the accident she had never had any of these fits of hysteria, and never spent a sleepless night. A throat specialist testified that his knowledge of her hysterical attacks was derived from the physician who sent him to her for consultation. Another physician, agreed upon by the parties and appointed by the court, testified that when he examined her she had an attack and he concluded, from the symptoms related to him by her mother, sister and a physician who had previously treated her, that she was suffering from hysteria. A physician called by defendant, who at defendant's request had examined her about a month after the collision, at her home and in the presence of the physician who was then attending her, testified that her then attending physician gave him a history of her case and told him that her loss of speech had occurred previous to the collision. All of this testimony went in without objection. *Held*, that the plaintiff, by calling these various other physicians to testify concerning the same malady, waived her right to object to her said attending physician testifying for defendant (a) that he had detailed a history of the case to defendant's said physician and (b) that four weeks prior to the accident he had treated her for hysteria and continued to treat her for hysteria for the next four months.

2. **NEGLIGENCE: Instruction: Reasonably Practicable Care.** Where plaintiff sues for injuries received from a collision of street cars, on one of which she was a passenger, an instruction for defendant

that defendant was not "required to exercise any degree of care or foresight that was not reasonably practicable," and that if the jury found that "defendant had used all care and foresight reasonably· practicable under the circumstances and that the accident happened without negligence on the part of defendant," plaintiff could not recover, is unfortunate in the use of the words "reasonably practicable" and introduces an element of uncertainty, which may lead to confusion and misconstruction, but the error is not alone sufficiently material to require a reversal of the judgment for defendant.

Citations to Headnotes:   1, Witnesses, 40 Cyc. 2403; 2, Carriers, 10 C. J par. 1474.

Appeal from St. Louis City Circuit Court.—*Hon. Charles B. Davis,* Judge.

AFFIRMED.

*Frumberg & Russell* and *C. P. Berry* for appellant.

(1)  The court erred in admitting the testimony of Dr. Hartman, a physician who had attended the plaintiff for the injuries complained of, as the matters testified to by him were privileged and confidential.   Sec. 5418, R. S. 1919; Ariz. & New Mex. Railroad Co. v. Clark. 235 U. S. 669; Mellor v. Mo. Pac. Ry. Co., 105 Mo. 455; Hoy v. Morris, 13 Grey (Mass.) 519; Citizens' St. Ry. Co. v. Shepherd, 30 Ind. App. 193; Baxter v. Cedar Rapids, 103 Iowa, 599; Dutton v. Alvion, 57 Mich. 575. (2)  The verdict was against or contrary to the evidence.   O'Gara v. Transit Co., 204 Mo. 724; Hipsley v. Railroad, 88 Mo. 352; Lemon v. Chanslor, 68 Mo. 340; Logan v. Met. St. Ry. Co., 183 Mo. 605.   (3)  The court erred in giving and reading to the jury instruction numbered 7 on behalf of defendant.   (a)  It erroneously stated the law as to the care required of defendant.   Benjamin v. Met. St. Ry. Co., 245 Mo. 614; Smith v. Railroad Co., 108 Mo. 243; Wentz v. Railroad Co., 259 Mo. 450; Lemon v. Chanslor, 68 Mo. 356; Kirkpatrick v. Met. St. Ry. Co., 211 Mo. 68; Waller v. Railroad Co., 83 Mo. 615; Stauffer v. Met. St. Ry. Co., 243

Mo. 327; Loftus v. Met. St. Ry. Co., 220 Mo. 470; Hinzeman v. Mo. Pac. Ry. Co., 182 Mo. 626. (b) It was not justified by any evidence. Tierney v. United Rys. Co., 185 Mo. App. 724; Nagle v. Railroad, 169 Mo. App. 290; MacDonald v. Railroad, 219 Mo. 487.

*T. E. Francis* and *Ernest A. Green* for respondent.

(1) The court properly admitted the testimony of Dr. Hartman, an attending physician, for the reason that the plaintiff had waived the privilege, by testifying herself as to her alleged physical condition after the accident, and by introducing the testimony of other physicians relating thereto. State v. Long, 257 Mo. 199; Elliott v. Kansas City, 198 Mo. 607; O'Brien v. Imp. Mfg. Co., 141 Mo. App. 337. (2) The verdict was fully in accordance with the evidence produced and not in any way contrary to it. Wright v. Kansas City, 187 Mo. 691; Rearden v. Railroad, 215 Mo. 140. (a) There is no credible evidence that plaintiff sustained any physical injuries by reason of the alleged collision of the cars. (b) The plaintiff is not entitled to recover for nervous shock alone if the evidence fails to show a physical injury suffered by her. McCardle v. Peck Dry Goods Co., 271 Mo. 111; Perkins v. Wilcox, 294 Mo. 718. (3) Instruction numbered 7, given in behalf of defendant, was not improper and did not constitute reversible error. Feary v. Met. St. Ry. Co., 162 Mo. 75; Benjamin v. Railroad, 245 Mo. 614; Loftus v. Met. Ry. Co., 220 Mo. 478.

LINDSAY, C.—The plaintiff asked for $40,000 as damages on account of personal injuries, which she alleged she sustained while she was a passenger on one of the street cars operated by the defendant, in the city of St. Louis. Upon the trial of her suit the jury returned a verdict in favor of the defendant. Three grounds are assigned here as reasons why the judgment entered for defendant should be reversed and the cause remanded: (1) That the court erred in permitting one of the physicians, who had treated plaintiff, to testify

for the defendant; (2) that the verdict is against or contrary to the evidence; (3) that the court erred in giving defendant's instruction numbered 7, in behalf of the defendant.

Reserving some features of the evidence for more particular notice under their relation to the errors assigned above, the principal events shown are now given. At a little before eleven o'clock on the night of August 10, 1919, the plaintiff, a young woman of eighteen years, with her sister and mother, was a passenger on an electric street car, which, running northward on Hamilton Avenue, turned to an easterly direction on Etzel Avenue, in St. Louis. Near or at the turn eastward, the trolley pole of the car came off twice and was twice replaced by the conductor, and came off the third time, when the car was a short distance east of the turn. The car was then in darkness, and while the conductor was upon the ground re-placing the trolley, an east-bound car, approaching on Etzel Avenue, after stopping and the throwing of the switch, proceeded east on Etzel Avenue, and collided with the rear end of the car in which plaintiff was riding. The conductor of the front car, who was on the ground engaged in adjusting the trolley, was injured, so that he was taken to the hospital. The glass in the headlight of the rear car was shattered, and the fender or guard of the rear car was bent. There was no dispute of the fact that plaintiff was a passenger, nor that the collision occurred, nor much as to the degree of violence of the collision, which was not very great, the rear car not having at the time attained a high speed. The plaintiff described it "as a real hard bump, something like a gun went off." Continuing she testified:

"After the bump the car got lighted and all I remember was unconsciousness and hysteria. I don't remember anything after that. The next thing I remember I was in bed at home. I don't know how I got there. I remained in bed at home six weeks continuously after the accident. Quite a while after that I went to the hos-

pital, the Missouri Baptist Sanitarium, and stayed there not quite six weeks. After that I was taken from the hospital to my home, where I was in bed for about two weeks. At home right after the accident I was not able to speak, could not use my voice. My back and my sides and my abdomen were injured. They were bruised, and I have been suffering with pain ever since. I was able to get up from my bed and move around just a few weeks after returning home from the hospital. I don't know exactly how long. When I was at the hospital the first time for about six weeks I was not able to use my voice at all. I didn't recover my voice for a little while before I left the hospital.''

Her testimony was that these attacks of hysteria had continued to come at intervals of about one a month; that they came suddenly, and she could not remember what happened when they came; that on these occasions she became very weak, and would have to remain in bed about two weeks, and that she lost her voice as a result of the accident, occasionally regaining it, and then losing it again, the loss of voice it appears, being incidental to or coincident with the attacks of hysteria.

I. The first question, important in itself and also having no little to do with the determination of the question whether the verdict is against or contrary to the evidence, is the question whether the court erred in allowing defendant to use Dr. Hartman as a witness, and have him testify, over plaintiff's objection, to plaintiff's condition before the alleged injuries. Plaintiff's claim was that she had been in perfect health, and that the collision was the cause of injuries which manifested themselves in the attacks of hysteria from which she suffered, with the attendant loss of voice. In testifying she spoke of these as ''hysterical attacks,'' or ''hysteria'' with the attendant loss of voice. A highly important question, then, was her condition in that regard, prior to the time

*Waiver: Physician as Witness.*

of the collision. Upon this she testified: "I have had physicians waiting on me and treating me for this trouble since the accident. Before the accident I could use my voice normally, and never knew what sickness was. I never had any of these fits of hysteria before the accident, never knew what they were. Before the accident I never spent any sleepless nights; I used to sleep like a log. I have not been able to work since the accident." She said also: "I have had about seven doctors since this accident." She testified that Dr. Hartman was the first physician who treated her. Dr. Hartman was called, and examined the plaintiff early on the morning after the collision. He continued to treat her until about November 12th following. The testimony of Dr. Hartman will be noticed further on. After him she was treated by Dr. Singer, and also by Dr. Fry, neither of whom were produced as witnesses. At the time of the trial Dr. Boogher was treating the plaintiff, and had been doing so since about Thanksgiving Day, 1919. Referring to his first call upon her he testified: "I found her suffering from an attack of hysteria. She was in bed, and seemed to be entirely out of control. I can only characterize it by saying she was howling, yelling and crying in a loud tone of voice and tossing her body all about the bed, arms and legs, used them like flails, and seemed out of control entirely of herself or anyone else. I prescribed for her at that time and remained until she was quiet. I tried to talk to her, but there was no use trying to do that at that time. I saw her right frequently professionally after that for the next two weeks. When she got up and went about I think she recovered her ability to talk at that time and did converse with me normally. At very frequent intervals I have been called back to look at the case again, and the same situation, the same condition of affairs. I have seen her in eight or ten of these attacks. After one of these attacks the patient would be more or less exhausted for several days, and remained in bed sometimes a

week or ten days.  This condition apparently prevailed after all of these attacks.  There are times when she speaks as well as anyone else.  There are other times when there is some difficulty or rather some interference with her desire to speak.  She wants to talk, but it seems there is a broken connection somewhere and she can't. On occasions she whispers just like she did to-day.  The loss of speech would be incidental to some of these attacks.  I attribute them to part of the nervous exhaustion that the patient suffered as a result of these attacks.''  Answering a hypothetical question Dr. Boogher testified that the present physical condition could have been caused by the collision resulting in her being thrown to the floor and as a result becoming unconscious and hysterical.

The plaintiff was also examined and treated by Dr. Goldstein whose profession was that of ear, nose and throat specialist.  He first saw her on February 11, 1920.  He found her ''in a condition of hysterical euphonia, which is loss of voice due to functional disturbance of some of the nerve mechanism of the larynx.'' He treated her at intervals until April 7, 1920.  There was at times total loss of voice.  He made tests recognized in his profession.  He said: ''Further I just inquired into the history of the case that I needed for my own special field.  The history of the case was revealed to me''—I did not know anything more about these attacks of hysteria to which she was subject than what was told me by the physician who sent her to me for consultation.  That physician was Dr. Singer.''

The plaintiff was examined by Dr. Deppe, a physician agreed upon by the parties and appointed by the court, and he was called to testify by plaintiff.  Upon the first occasion when he saw her at his office, her mother and Dr. Boogher were present, and at that time plaintiff became hysterical: ''Was quite excited, screaming, later was unable to talk,'' and only quieted down after Dr. Boogher administered some medicine.  No examination

could be made at that time, but on the following morning the witness examined the plaintiff at her home. At that time also she had another attack as the witness was about to leave, lasting a few minutes. He said: "I came to the conclusion she was suffering from hysteria, and the attack that she had at the present time, and the symptoms which she had which were related to me by her mother, and sister and Dr. Boogher, could be attributed to this hysterical condition. I found no evidence of any organic involvement of the nervous system."

The defendant called Dr. C. A. Powell who examined the plaintiff on September 9, 1919, about one month after the collision, at the request of defendant. This examination was made at the home of plaintiff, and Dr. Hartman, plaintiff's then attending physician, was present. After describing the examination made by him of plaintiff's person, and the nature of the complaints made by her to the location of the pains suffered by her, and her complaint of loss of voice, Dr. Powell further testified:

"I made a thorough examination and removed the garments as much as was necessary. I found no objective symptoms at that time. Objective symptoms are those symptoms that we can elicit by observation, palpation, percussion, manipulation or means that we have at our hands for bringing out these things. Subjective symptoms are the symptoms that are given us by the patient. I found no objective symptoms. Miss Weissman complained of pain and discomfort in the right flank, over the hip, and in this flank she complained of pain, tenderness and discomfort; she also complained of an inability to speak plainly. In making this examination I secured a history from the patient as much as I could, and that was supplemented by an occasional answer from her relatives and the physician that was there. Relative to the impediment in her speech, her sister told me that Miss Weissman had had an attack similar to this some weeks before in which she had developed an impediment in her speech, following some

nervous shock that she had sustained; I have forgotten
what it was, but it was following some nervous shock
that she sustained. The doctor who was in attendance
gave me some history with reference to having treated
her for this condition. He said that he had observed
her and I think he said treated her for this attack that
she had had some time before that. This examination
was made about a month after the accident. August
10th is the date they gave me, and the examination was
on September 9th. I have not examined or seen her
since. That was the only examination that I made so
far as I remember, and if I have seen her since I don't
remember. I mean I haven't seen her professionally
since. From the history that was given me the attack
of loss of speech was previous to the street car accident.
I asked them that question, if she had ever had an attack
like this before, and that was the answer that they gave
me, that she had.''

As far as the record shows, the foregoing went in
without objection. Afterward the defendant called Dr.
Hartman, and made inquiry of him as to whether he
had given Dr. Powell the history of the case, whether he
had treated the plaintiff prior to the time of the colli-
sion, and the history of the case given to him at such
prior treatment, and the condition in which he found the
plaintiff when treating her before the time of the colli-
sion. The court overruled plaintiff's objection to this
evidence, holding that there had been a waiver of the
privilege claimed, through the calling by plaintiff of
other physicians to testify concerning the same malady.
Under the ruling, Dr. Hartman testified that at 4:30
of the morning of July 13, 1919 (four weeks before the
alleged injuries), he had been called to treat the plain-
tiff, found her suffering from hysteria; that he treated
her for hysteria, and that he continued to treat her for
hysteria from July 13, 1919, to about November 13, 1919.
He also gave the history which had been given to him
upon this first visit, that plaintiff had previously received
a nervous shock and been hysterical.

The question is whether the court erred in permitting Dr. Hartman to testify that plaintiff had suffered from hysteria, and had been treated for it by him, before the time of the occurrence of the injury for which she sues. Her testimony as to her condition of perfect health before the time of the street car collision has been set out. She testified without qualification that she had never been afflicted with hysteria before the collision here involved, nor with loss of her voice. According to her statement all of the doctors she mentioned treated her for that identical trouble, that is, hysteria, except that Dr. Goldstein treated her as a specialist for loss of voice. He diagnosed that as "hysterical euphonia." Dr. Boogher spoke of the loss of voice as a condition incidental to the hysteria. There was no diagnosis by any doctor other than that of the existence of a condition of hysteria, or, subjection to those attacks, attended by the loss of voice. There was no treatment shown to have been given for any other affliction of the plaintiff. We are of the opinion that by reason of the foregoing, the privilege claimed under Section 5418, Revised Statutes 1919, was waived. The case falls within the principle announced by this court in State v. Long, 257 Mo. 199. In that case the State used one physician, but claimed the privilege of calling two others, who at slightly different dates had examined the prosecutrix for the same malady. It was said by GRAVES, J., at page 217:

"In this the State is much like a plaintiff in a personal injury suit, when the plaintiff attempts to prove the character of the injuries by one of the many physicians whom she may have had attending her. We can see no difference in the rule which should be applied in these two instances. The question is, can the party give to the world the secrets of the sick room through her chosen physician, selected for that purpose, and yet claim the privilege as to all of the other physicians whom she has had treat the same injury or trouble. In the case at bar the real secret of the sick room was the malady or trouble from which the prosecutrix was suffering. This

trouble she herself undertook to publish to the world—whether truthfully. or not is another matter. Not only so, but she consented to one of the attending physicians likewise publishing this condition of hers. And if the several physicians treat for the same trouble (as is the case here) then it can make no difference that their treatment was at different dates."

Further on it was said at page 221:

"We concede the statute of privilege to be a wise one, but it should never be so construed as to make it both a shield and a dagger at one and the same time. If the patient is suffering from a malady the physician should not be allowed to first bring to light that affliction of the patient. The very purpose of the statute is to hide, as with a veil, the malady and trouble for which the physician treated her, and what may have passed between them in the confidential relationship of physician and patient. But when the veil has been lifted by the patient or with her consent, and the secrets of the sick chamber given to the world, what logic is there in saying that the patient can clog the wheels of justice itself, by closing the mouth of other physicians, who know the real facts. In other words, if the patient raises, or permits to be raised, the veil of secrecy with lying lips as to what the conditions were, should this waiver of secrecy still leave to her the power of suppressing truth, by objecting to other physicians who about the same time treated her for the same identical alleged trouble? We think not. In other words if a patient is suffering from a given malady, and is treated by several physicians near the same time, for the said same trouble or malady, then if she and one of her physicians with her consent, make public the character of her trouble, she has waived the right to longer keep the exact character of that trouble further secret, and the other physicians are competent to testify as to what this malady or trouble was in reality. Any other rule would be but to permit a patient in a court of justice to play both fast and loose."

A like question was involved in McPherson v. Harvey, 183 S. W. 653, the immediate subject of inquiry there being the competency of certain alleged newly discovered evidence. The Kansas City Court of Appeals said, at page 654:

"The important question for solution in the consideration of the ruling of the court is whether or not the newly discovered evidence, which consists of the knowledge a physician of plaintiff acquired of her state of health during the existence of the confidential relationship between them of physician and patient, is privileged and may not be used against plaintiff without her consent. There can be no doubt that it was privileged at the beginning of the trial, and, if plaintiff had done nothing to waive such privilege, defendants would not have had the right to offer the witness at the trial, and therefore could not avail themselves of his testimony as newly discovered evidence. In her own testimony, as well as in that of her physician and surgeon, plaintiff went into the subject of her malady, exposing everything and concealing nothing, except the highly important fact, if it is a fact, that the malady was not caused by the injury, but was of long standing and had been accurately diagnosed, but unsuccessfully treated, by a physician for almost two years. In the recent case of Michaels v. Harvey, 179 S. W. 735, after a careful review of the decisions of the Supreme Court bearing on the subject, we applied the just and sensible rule announced in State v. Long, 257 Mo. l. c. 221, 165 S. W. 748, that where the patient for purposes of gain or advantage discloses the nature and secrets of his malady he renounces his statutory privilege, and opens the door to a full judicial inquiry into the subject-matter of his own importation into the case, and that where several physicians have treated the patient for the same trouble it can make no difference that their treatment was at different dates. Under this doctrine, the physician would have been a competent witness at the trial, and we pass to the question of the propriety of the ruling in granting a new trial on

the ground that his testimony should be 'treated as newly discovered evidence within the technical meaning of that term.''

Other cases dealing with the subject are: Elliott v. Kansas City, 198 Mo. l. c. 607; O'Brien v. Implement Co., 141 Mo. App. l. c. 337; Michaels v. Harvey, 179 S. W. l. c. 738; Epstein v. Railroad, 250 Mo. 1. In the last named case, Mellor v. Railroad, 105 Mo. 455, a case cited for the plaintiff here, is cited and discussed to some extent. The somewhat general statement made in Mellor's case cannot apply here in view of the circumstances here shown, and of the numerous later decisions of this court. We rule against the appellant upon this point.

II.   It is next contended that the verdict is against or contrary to the evidence. The evidence is to be considered upon this issue. The only testimony of plain-
tiff as to direct or external injuries received
**Verdict Contrary to Evidence.** was: ''My back and my sides and my abdomen were injured. They were bruised and I have been suffering with pain ever since.''
After the accident she and her mother and sister were taken home in an automobile. Her sister testified that she assisted in undressing the plaintiff and getting her to bed on that occasion, but nowhere in her testimony spoke of finding any bruises upon plaintiff's person, or of looking for any then, or at any later time. The plaintiff's mother testified, but no mention was made by her of cuts, bruises or any external injury to plaintiff's person. The only testimony of the existence of any such is the above quoted statement of the plaintiff herself. The plaintiff's testimony was that she and her sister sat in the second seat from the rear, on the left side of the aisle; that she sat next to the window, and her sister sat next to the aisle. Their mother sat in a seat toward the front of the car. Another passenger, Emma Carres, called by the plaintiff, testified: ''I saw Jennie Weissman in the car that night. I didn't see where she was

thrown, but I saw the mother right across from me and she was in back of the mother, and I heard curious sounds, drew my attention to what was going on. Sounds like she called for help. It was more in her throat. She didn't say, but it was just like a kind of gurgling sound like she was calling for help and her sister tried to console her, and I couldn't do anything because I was hurt. Jennie was near her sister, but not on the floor. . . . It was the sister that sat next to the window in the second seat that was trying to say something and couldn't. She was raising up, trying to raise up, and was holding onto the seat, and trying to make a sound, and her sister was trying to console her that it was all right.'' The plaintiff testified: ''I think that an officer and a man removed me from the street car to my home.'' Plaintiff's sister, Dina Weissman, testified that ''two policeman came in and they carried both my mother and my sister off the street car to some of the steps on Etzel Avenue.''

One of the policeman called by the plaintiff, the witness McDonald, testified that when he reached the street car in question at eleven o'clock, all of the people were out of that car. He testified, on his direct examination: ''I inquired around for witnesses to the accident and in doing so I got Mrs. Weissman and her two daughters. I saw Jennie Weissman that night on the sidewalk. Mrs. Weissman and her two daughters were together and I got their names, and Mrs. Weissman complained of her back being hurt. Jennie at that time was in a kind of nervous state; she was trying to speak, and she would throw her head back. She could not talk outside of guttural noise. I talked to her and she tried to talk to me, but couldn't speak. Officer Miller took her home in some gentlemen's machine that volunteered to take her home  At the time there was an ambulance there, and I asked her if she wanted to go home in the ambulance, and they stated no, they didn't want to go home in the ambulance.'' This witness on cross-examination testified: ''When I got there everybody was out of the car

and I saw Mrs. Weissman and her two daughters standing on the sidewalk. I had a conversation with Mrs. Weissman with reference to her daughters in the presence of Jennie Weissman. I asked Mrs. Weissman if her daughter had been hurt, she said no, she hadn't been hurt much, that she was hurt a little bit, but before this thing happened the daughter had been in a nervous state, and she would be all right in a little while. That was in the presence of Jennie Weissman. She stated she had been under the doctor's care for quite a while for nervous disease. She stated she had trouble with her speech and couldn't speak very good. This was after the accident. That is, it was before the accident that she had been treated by a doctor for this nervous trouble. Mrs. Weissman said she was troubled with her speech and nervous trouble before this time and had been under a doctor's care for it. I did not go home with them; I went from there back to the station in the wagon and continued to make my report.''

The other policeman, the witness Griffith, also called by plaintiff, testified that he arrived on the scene about eleven o'clock. He said ''When I got there I saw there was an accident on Etzel Avenue, two cars standing there with a crowd of people, and the conductor of the first car was lying on the ground. He had been out putting the trolley pole on, and a citizen volunteered to use his machine to take the conductor to the hospital. I made inquiries at the time if anybody was hurt before I proceeded to the hospital with the injured man, and nobody else answered; so I left the accident then. The cars were about four or five feet apart. The headlight of the second car was broken, and the front guard was bent just as if something was smashed. It was just mashed in like something had forced it back. It is made of thin pieces of steel. I did not see the plaintiff there.'' On cross-examination: ''At the time I got up there around eleven o'clock there was nobody on the car. I inquired to find out who was hurt and I only found the conductor.

I did not help anybody off the street car; both cars were empty when I got there."

Wilbur Thomas, a student, a witness called by plaintiff, testified that he was standing at the southwest corner of Hamilton and Etzel avenues, talking with another man. He saw the front car, and noticed that the trolley pole came off, the first, second and the third time. "This car (referring to the front car) was up two or three car-lengths, and the trolley came off and it was dark." According to this witness the rear car came to the switch at the intersection of Hamilton and Etzel avenues. Some one threw the switch, and the rear car "came up the hill, came east on Etzel and smashed into" the front car. The front car at this time "was two or three lengths east of Hamilton on Etzel." Further on, he said: "After the accident occurred I went up there. I saw people getting off the car. As I remember it, two young ladies were helping their mother off the car. I did not see any officers helping them off. The conductor was outside. The headlight on the car was broken. That is all I saw. From where I was down there there wasn't a loud crash, but I could hear it. Like two things came together. The car was not going very fast. It was going up hill. There is a hill going up Etzel and then it goes over the hill."

V. R. Musler, who also was standing on the corner of Hamilton and Etzel avenues, was a witness for plaintiff. On direct examination he testified: "It couldn't have been a very hard crash because the rear car only went about a hundred and fifty or two hundred feet." And on cross-examination: "I was standing on the southwest corner. This other car came along and wasn't going very fast and the crash wasn't a very hard crash."

Dr. Hartman, referring to the examination of plaintiff's person on the morning after the collision, testified: "There were practically no objective symptoms; I don't just recall any; they were all of very minor importance; if there were any external injuries there were no objective signs." When asked as to the condition in which

he found plaintiff at 4:30 on the morning of July 13, 1919, four weeks before the street car collision, he testified: "Found her excited; I don't just recall now when I came at that time in the morning whether her sister, Miss Dina, had been trying to pacify her on the outside; she wanted to get her to herself, she was out in front of their home, and I don't just recall—I know that was the history of it. I don't quite get a mental picture of it now, but she was taken into the house and put to bed, and I made the examination, and I made the diagnosis of hysteria and prescribed accordingly."

Dina Weissman, plaintiff's sister, who was with her on the street car, contradicted the police officer, plaintiff's witness McDonald, as to there being any conversation such as was stated by him, with the witness, with plaintiff, or with her mother. She also contradicted the statements of defendant's witness Dr. Powell as to any conversation had when he, with Dr. Hartman, called to examine plaintiff, on September 9, 1919. She testified as to that: "When Dr. Powell and Dr. Hartman came in the room, they went up in the bathroom, and I happened to have my watch in my apron pocket, and they were in the bathroom forty-five minutes on the time of my watch. He did not ask me any questions. I didn't have time to say anything because Dr. Hartman took him upstairs and made me stay down stairs. I didn't say anything to him." Denying the statement of Dr. Hartman, she said: "The first time he ever treated Jennie was in the morning of August 11th. He never treated Jennie for any nervousness or anything else prior to that time, and he never prescribed for Jennie." She also went into details of a conversation she said she had with Dr. Hartman in November following, concerning the settlement of plaintiff's claim, or the prosecution of a suit, not necessary to further notice here. The plaintiff's sister, said Dina Weissman, on cross-examination also testified: "I was in the accident and have a suit pending in this court. Growing out of the same action that my sister was in."

Plaintiff's mother testified, denying that she talked

to anybody, or told a policeman on the night of the accident that her daughter Jennie was sickly and couldn't sleep, and was very nervous.'' On cross-examination she said: ''I sued the company on account of the accident, at the same time with Jennie.''

The determination of the true facts, upon all this conflicting and wholly irreconcilable testimony, was for the jury. We cannot say upon the testimony in this record that the verdict was against or contrary to the evidence.

Plaintiff's testimony, heretofore set out, is most scant in its reference to physical injuries suffered by her, is almost casual in that respect, and is not supported by any testimony on that subject from her sister, who helped to undress her on the night in question, or by statements of anyone else. There is some testimony the other way, and all of this and all the circumstances shown were for the jury to consider. [Wright v. Kansas City, 187 Mo. l. c. 691; Rearden v. Railroad, 215 Mo. l. c. 140.] The burden of plaintiff's claim, under the evidence, was the sustention of a nervous shock, causing hysteria and resultant loss of voice, never before experienced by her. As to this, the conflicting character of the evidence was also a matter for the jury. But, if she suffered no physical injury, she was not entitled to recover for nervous shock alone. [McCardle v. Peck Dry Goods Co., 271 Mo. 111; Perkins v. Wilcox, 294 Mo. l. c. 718.]

III. The remaining question raised is upon an instruction given for defendant. This instruction told the jury that defendant was not ''required to exercise any degree of care or foresight that was not reasonably practicable,'' and further that if the jury found that ''defendant had used all care and foresight reasonably practicable under the circumstances and that the accident happened without negligence on the part of defendant,'' then plaintiff could not recover.

*[margin note: Reasonably Practicable.]*

An instruction of like purport was approved in Feary v. Metropolitan St. Ry. Co., 162 Mo. 75. But later, in Benjamin v. Metropolitan St. Ry. Co., 245 Mo. 598, an instruction using the word "unreasonably" in the same connection, was criticized. Judge VALLIANT said, at page 614:

"The adverb 'reasonably' used in the instruction to qualify the adjective 'practicable' introduces an element of uncertainty into the sentence. The duty of the carrier is to exercise the highest degree of care practicable. The word practicable means 'capable of being done or accomplished with available means or resources.' [Webster.] The element of reasonableness is in that definition. What is unreasonable is not practicable. But when the word 'reasonably' is used to qualify the word 'practicable' it is confusing and is liable to misconstruction. The law is always reasonable, and it considers it reasonable to require of carriers a high degree of care, but that fact would not justify an instruction to the jury that the law requires the carrier to exercise a reasonably high degree of care. In that connection the word 'reasonably' would so qualify the word 'high' as to reduce the phrase to 'reasonable care.' We do not approve the word 'reasonably' as used in this instruction, but if that were the only error in the case we would not say the error was sufficient to justify the granting of a new trial."

In Stauffer v. Metropolitan St. Ry. Co., 243 Mo. 305, 327, the instruction applied required of the defendant "the highest practicable degree of care of a very prudent person engaged in like business." In Loftus v. Metropolitan St. Ry. Co., 220 Mo. 470, the question of the proper instruction as to the duty of common carriers to their passengers was under consideration. There, at page 478, was quoted an instruction which told the jury that if the defendant could have prevented "said collision by the exercise of the very high degree of care and foresight of skilful, prudent and practical railroad operatives under the same or similar circumstances, then plaintiff was entitled to recover." Of this, GRAVES, J.,

said: "That instruction states the law with reference to the care defendant was bound to exercise to prevent an injury to the plaintiff, and is couched in approved language." The instruction in the case at bar is, we think, subject to the criticism, made in the Benjamin case; but, it was said in that case that the judgment would not be reversed solely because of the character of the instruction there given. We have reached a like conclusion in the instant case.

The judgment herein should be affirmed. It is so ordered. *Seddon, C.,* not sitting.

PER CURIAM:—The foregoing opinion of LINDSAY, C., is adopted as the opinion of the court. All of the judges concur; *James T. Blair, P. J.,* and *Ragland, J.,* in paragraphs 1 and 3 and in the result.