Collette BASS, Appellant,

v.

NOONEY COMPANY, a corporation, and Otis Elevator Company, a corporation, Respondents.

No. 63926.

Supreme Court of Missouri,
En Banc.

Feb. 23, 1983.

Rehearing Denied March 29, 1983.

William R. Kirby, David Fischer, St. Louis, for appellant.

George F. Kosta, Phillip Franklin, St. Louis, for respondents.

SOLBERT M. WASSERSTROM, Special Judge.

Plaintiff Collette Bass seeks damages for mental distress caused by the alleged negligence of defendants Nooney Company and Otis Elevator Company. Trial started before a jury, but at the close of plaintiff's evidence each defendant moved for a directed verdict. Both motions were sustained by the trial court on the ground of the "impact rule." Plaintiff appealed to the Missouri Court of Appeals, Eastern District, which affirmed. On plaintiff's application, this court ordered transfer here. We reverse and remand for a new trial.

The evidence introduced on behalf of plaintiff showed the following facts. Plaintiff was employed by General Dynamics Company which occupied several floors of the Pierre Laclede Center, a structure owned and operated by defendant Nooney.[1] Plaintiff's duties in part consisted of serving as a relief receptionist so that the regular receptionists on various floors could take periodic rest breaks and lunch periods.

On April 6, 1976, plaintiff entered an elevator at the 20th floor about 11:15 a.m.[2] in order to go to the 23rd floor to relieve the receptionist there. The elevator started in the usual manner, but then plaintiff heard a grinding noise and the elevator came to a stop. Plaintiff waited a short while, hoping that the elevator would start up again, but when it did not she began punching the emergency button. She could hear the emergency bell ring, but no voice came through the intercommunication system inside the elevator, nor did any help come from the outside.

After about 10 to 15 minutes, plaintiff began to pound on the door of the elevator and shout for help. Response came from a man in the corridor who announced himself simply as "Don." Plaintiff asked him to summon someone who could get her out and also to notify her work supervisor. Don cautioned plaintiff "don't panic" and he said he would get help. Soon thereafter plaintiff's supervisor did call to her through the door and asked how she was. Plaintiff responded that she was beginning to feel dizzy. After about 15 minutes, plaintiff was getting warm and feeling strange.

1. Although plaintiff alleged ownership of the building by Nooney, she offered no evidence directly in support. Nooney did file a cross-claim against its co-defendant Otis, in which Nooney alleged a contract between it and Otis under which Otis undertook the maintenance of the elevator, and a copy of the maintenance agreement was attached to that pleading. No contention is being made by Nooney that it was not the owner and operator of the building at the time in question. On retrial, plaintiff will of course have an opportunity to supply direct evidence showing Nooney's ownership.

2. At another point in her testimony, plaintiff estimated that she boarded the elevator "at about quarter of eleven."

She went to a corner of the elevator and slid to the floor.

The maintenance people eventually arrived about thirty minutes after the elevator stalled, and they instructed plaintiff to try to pry apart the inner elevator doors while those on the outside worked at prying open the outer doors. Finally at about 11:45 a.m. the elevator doors were opened, disclosing the elevator to have stopped about a foot above the floor. Plaintiff was assisted from the elevator and her supervisor took her to the ladies room where a cold towel was put on her head and face. She was instructed to spend the balance of the day at her desk doing whatever work she could there without using the elevators. At the end of the working day, she asked a fellow worker to drive her home. During the course of that ride the driver remarked that she seemed to be "sliding and bobbing."

After a restless night at home, plaintiff reported to work the next day. During that day she boarded an elevator, but after ascending one floor she fell over, was caught by other passengers and was taken to an area close by. A company doctor was called, who advised her to go to the hospital and he escorted her there. On examination at the hospital, she was hyperventilating, unable to speak above a murmur, was lightheaded and anxious. Her history as reflected by the hospital record, showed that she had experienced acute anxiety, slurred speech, her equilibrium was off, she felt lightheaded, cold and thoroughly frightened and too scared to sleep the night before.

Plaintiff was admitted to the hospital and was interviewed by a psychiatrist, Dr. Hartnett. She was placed under heavy sedation and stayed as a hospital patient for a period of five days. After plaintiff was released from the hospital, she made office visits to Dr. Hartnett twice and also talked to him by telephone about medication. She did not return to work until May 2, 1976, almost a month after the elevator incident. Since then, she gets tense and her head feels strange if she rides an elevator to a high altitude, she is tense riding in cars, and she is not as patient with her family and children as she used to be.

Dr. Hartnett, the attending psychiatrist, testified that when he saw plaintiff at the hospital, she suffered from extreme anxiety and was unable to speak clearly. She had objective symptoms of anxiety, hyperhidrosis of her palms, she was hyperventilating, her pupils were dilated, and her walking was unstable. His medical diagnosis was a severe anxiety reaction which he testified, with medical certainty, was precipitated by being stuck in the elevator. He agreed, however, that contributing factors to the situation were the facts that plaintiff was at that time in the process of obtaining a divorce and that she was taking care of her mother who had recently suffered a stroke. Dr. Hartnett reported to General Dynamics Company that plaintiff was able to return to the duties of her employment as of May 2, 1976, and he also expressed an opinion in a report dated July 15, 1976, that plaintiff would not have any permanent disability from the emotional damage done to her by reason of the elevator incident.

Plaintiff also introduced the testimony of William Faughn, Jr., an Otis employee, who testified that Otis had a full maintenance contract for the Pierre Laclede Center elevators, that Faughn serviced that building once a day, and that the management personnel or building maintenance personnel had nothing to do with maintaining the elevators.

The trial court entered its directed verdict and the court of appeals affirmed on the basis that plaintiff suffered no physical trauma at the time of the elevator episode. Whether such physical trauma should be required as a prerequisite for recovery is the principal question for decision. However, there is a preliminary question to be considered as to whether plaintiff can properly rely upon the principle of res ipsa loquitur under the facts of this case.

I.

Plaintiff made no effort to prove any specific acts of negligence by either defendant. Rather, she relied on the doctrine of

res ipsa loquitur. Defendants deny that the doctrine mentioned has any application here.

■ The doctrine of res ipsa loquitur applies when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; and (c) the defendant possesses superior knowledge or means of information as to the cause of the occurrence. This doctrine has frequently been applied in elevator cases. *Clark v. Linwood Hotel,* 365 Mo. 982, 291 S.W.2d 102 (1956); *Warner v. Terminal R. Ass'n of St. Louis,* 363 Mo. 1082, 257 S.W.2d 75 (1953); *Meade v. Missouri Water & Steam Supply Co.,* 318 Mo. 350, 300 S.W. 515 (1927); *Bartlett v. Pontiac Realty Co.,* 224 Mo.App. 1234, 31 S.W.2d 279 (1930); *Stroud v. Booth Cold Storage Co.,* 285 S.W. 165 (Mo.App.1926).

■ No valid objection to the application of the doctrine can be made here on the ground of there being two defendants. On the facts of this case, the jury could reasonably find that either or both of the defendants were in control of the elevator, so as to make the application of res ipsa loquitur proper. *Greet v. Otis Elevator Company,* 187 A.2d 896 (D.C.1963). *See Crystal Tire Company v. Home Service Oil Company,* 465 S.W.2d 531 (Mo.1971).

■ Defendants contend, however, that there can be no application of the doctrine here because the evidence does not show any sudden lurch or similar violent movement to the elevator. But whether the elevator fell downward (as was true in *Warner, Meade* and *Bartlett*), made an unexpected start (as was true in *Stroud*), jerked upward (as in *Clark*), or stalled between floors as here, all are sudden unusual malfunctions which would not normally occur without negligence of the parties in charge. Res ipsa loquitur therefore applies.

## II.

The entrenched rule presently in force in Missouri is that a defendant is not liable for negligence resulting in emotional distress unless the plaintiff suffered a contemporaneous traumatic physical injury. *Trigg v. The St. Louis, Kansas City & Northern Railway Company,* 74 Mo. 147 (1881); *Connell v. Western Union Tel. Co.,* 116 Mo. 34, 22 S.W. 345 (1893); *Weissman v. Wells,* 306 Mo. 82, 267 S.W. 400 (1924); *Porter v. St. Joseph Ry., Light, Heat & Power Co.,* 311 Mo. 66, 277 S.W. 913 (banc 1925); *Chawkley v. Wabash Ry. Co.,* 317 Mo. 782, 297 S.W. 20 (banc 1927); *Gambill v. White,* 303 S.W.2d 41 (Mo.1957); *Brisboise v. Kansas City Public Serv. Co.,* 303 S.W.2d 619 (Mo. banc 1957); *Pretsky v. Southwestern Bell Telephone Company,* 396 S.W.2d 566 (Mo.1965); *Williams v. School District of Springfield R–12,* 447 S.W.2d 256 (Mo.1969); *Crutcher v. Cleveland, C., C. & St.L.R.R.,* 132 Mo. App. 311, 111 S.W. 891 (1908); *Heiberger v. Missouri & Kansas Telephone Co.,* 133 Mo. App. 452, 113 S.W. 730 (1908); *McCardle v. George B. Peck Dry Goods Co.,* 191 Mo.App. 263, 177 S.W. 1095 (1915); *State ex rel. and to Use of Renz v. Dickens,* 95 S.W.2d 847 (Mo.App.1936).

Under the authorities just cited, the trial court had no choice but to sustain the motion to dismiss and the court of appeals had no choice but to affirm. The question before this court is whether the long standing "impact rule" should be reconsidered and changed.

The impact rule developed concurrently in England and in the United States during the latter part of the 19th century. The case generally considered to be the leading one was *Victorian Railways Commissioners v. Coultas,* 13 App.Cas. 222 (P.C.1888). Although *Victorian Railways* was overruled in Great Britain thirteen years later, the impact rule flourished and grew to general acceptance in this country. The rule was adopted in New York by *Mitchell v. Rochester Ry. Co.,* 151 N.Y. 107, 45 N.E. 354 (1896) and in Massachusetts by *Spade v. Lynn & B.R. Co.,* 168 Mass. 285, 47 N.E. 88 (1897). These cases proved greatly influential and began to be followed uniformly in other states.

The reasons generally given for adopting this rule were the following: (1) the difficulty in proving a causal connection between the damages claimed by the plaintiff and the act of the defendant which is claimed to have induced the mental and emotional distress; (2) permitting such suits would encourage imaginary and fraudulent claims; and (3) the probability that permitting recovery would release a flood of new litigation made up of such claims.

Ever since the turn of the century, the impact rule and the rationale given in support of it came under a barrage of scholarly criticism. The leading and most frequently cited articles on the subject are: Throckmorton, *Damages for Fright,* 34 Harv.L. Rev. 260 (1921); Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv.L.Rev. 1033 (1936); Prosser, *Insult and Outrage,* 44 Cal.L.Rev. 40 (1956); Comment, *Negligently Inflicted Mental Distress: The Case For An Independent Tort,* 59 Geo.L.J. 1237 (1971); Comment, *Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases,* 35 U.Chi.L.Rev. 512 (1968); Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich.L.Rev. 874 (1939). Extensive collections of other writings appear in 63 Geo.L.J. 1179 (1975); Comment, *Bystander Recovery for Negligent Infliction of Emotional Distress in Iowa: Implementing an Optimal Balance,* 67 Iowa L.Rev. 333 (1982). Articles of especial local interest in Missouri are: Note, *Mental Distress—The Impact Rule,* 42 UMKC L.Rev. 234 (1973); Note, *Negligent Infliction of Emotional Distress Absent Physical Impact or Subsequent Physical Injury,* 47 Mo.L. Rev. 124 (1982); Note, *Torts—Negligence Without Impact,* 34 UMKC L.Rev. 474 (1966); Mo.Bar C.L.E., 1 Mo.Tort Law, § 5.1. Other recent law review articles are: Nolan and Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos,* 33 Hastings L.J. 583 (1982); Comment, *Duty, Foreseeability, and the Negligent Infliction of Mental Distress,* 33 Me.L.Rev. 303 (1981); Comment, *Molien v. Kaiser Foundation Hospitals: California Expands Liability for Negligently Inflicted Emotional Distress,* 33 Hastings L.J. 291 (1981); Note, *Negligent Infliction of Emotional Distress in New Jersey: Compensating the Foreseeable Plaintiff,* 32 Rutgers L.Rev. 796 (1979).

More importantly, experience showed more and more clearly the unfairness and inequity of the impact rule. For a long while the courts attempted to ameliorate the effects of the rule by an ever increasing liberalization of the interpretation of "physical impact." Eventually, however, the courts began an outright repudiation of the doctrine. By 1959, this trend had proceeded to the point where a clear majority of the jurisdictions had rejected any requirement of a contemporaneous physical trauma. Annot., 64 A.L.R.2d 100, l.c. 143 (1959). Since then still more jurisdictions have abandoned the impact rule, including New York and Massachusetts, the states of origin. *Battalla v. State,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961); *Dziokonski v. Babineau,* 375 Mass. 555, 380 N.E.2d 1295 (1978).

In answer to the objection concerning difficulty of proof as to mental trauma, the prevailing answer became that the development of psychiatric tests and refinement of diagnostic techniques have enabled science to establish with reasonable medical certainty the existence and severity of psychic harm. 63 Geo.L.J. 1179, 1185–86 (1975). Moreover, as stated in *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84, 87 (1970):

"Finally, even if we assume *arguendo* that a great deal of difficulty still remains in establishing the causal connection, this still does not represent sufficient reason to deny appellant an *opportunity* to prove his case to a jury. There is no reason to believe that the causal connection involved here is any more difficult for lawyers to prove or for judges and jurors to comprehend than many others which occur elsewhere in the law. 'We realize that there may be difficulties in determining the existence of a causal connection between fright and subsequent physical injury and in measuring the extent of such injury. However, the

problem of tracing a causal connection from negligence to injury is not peculiar to cases without impact and occurs in all types of personal injury litigation. * * * in any event, difficulty of proof should not bar the plaintiff from the opportunity of attempting to convince the trier of fact of the truth of her claim.' *Falzone v. Busch,* 45 N.J. 559, 561, 214 A.2d 12, 15–16 (1965). We recognize the recent view of the New Jersey Supreme Court as representative of current jurisprudence."

In answer to the argument that the impact rule was necessary in order to prevent fraudulent claims, the response generally has been that protection of such claims rests in the integrity of the judicial system and that the judiciary must find ways to solve problems, not avoid them. *Falzone v. Busch,* 45 N.J. 559, 214 A.2d 12, 16 (1965), gives a representative holding in this regard:

> "As to the possibility of actions based on fictitious injuries, a court should not deny recovery for a type of wrong which may result in serious harm because some people may institute fraudulent actions. Our trial courts retain sufficient control, through the rules of evidence and the requirements as to the sufficiency of evidence, to safeguard against the danger that juries will find facts without legally adequate proof."

In answer to the argument that permitting such claims would release the floodgates of litigation, experience in jurisdictions which abrogated the impact rule proved to the contrary. *Okrina v. Midwestern Corporation,* 282 Minn. 400, 165 N.W.2d 259, 263 (1969); Note, *Negligent Infliction of Mental Distress: Reaction to Dillon v. Legg in California and Other States,* 25 Hastings L.J. 1248, 1250 (1974). Furthermore, numerous courts announced the proposition that any increase in litigation should not be determinative, but rather that it was the duty of the courts to afford a forum for

the remedy of wrongs. *Robb v. Pennsylvania Railroad Company,* 58 Del. 454, 210 A.2d 709, 714 (1965), says typically, "if there be increased litigation, the courts must willingly cope with the task."

The courts generally nevertheless continued to recognize some value in the basic policy underlying the classic rule. In order to accommodate those policy considerations while at the same time avoiding the old rigidity, increased emphasis was placed on the requirement of foreseeability and a new requirement was announced that the emotional distress or mental damage must cause and result in some physical injury. These two conditions of recovery were considered to be necessary as a voucher for the genuineness of the plaintiff's claim.[3]

These requirements for recovery were included in the Restatement (Second) of Torts (1965). The foreseeability aspect is spelled out by § 313(1) as follows:

> "If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
>
> (a) should have realized that his conduct involved an unreasonable risk of causing the distress ... and
>
> (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm."

Comment c explains that, "[O]ne who unintentionally but negligently subjects another to such an emotional distress does not take the risk of any exceptional physical sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it...."

This matter of foreseeability is expounded in 2 Harper & James, *The Law of Torts,* § 18.4, as follows: "Generally defendant's standard of conduct is measured by the reactions to be expected of normal persons. Ordinarily he does not have the duty to be careful not to shock or frighten people. Activity may be geared to a workaday

---

**3.** This opinion will not digress to discuss the extensive debate and differing rules which developed in the "bystander" cases, where a plaintiff suffers mental or emotional distress upon observing death or injury to a third party caused by a defendant's negligence.

world rather than to the hypersensitive...."

The requirement that the emotional distress result in (although it need not be contemporaneously accompanied by) physical injury is set forth in Sections 436 and 436A of the Restatement. Section 436(1) states:

"If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability."

Section 436A states:

"If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."

Comments b and c under that Section justify and explain the requirement of physical injury as follows:

"b. The reasons for the distinction, as they usually have been stated by the courts, have been three. One is that emotional disturbance which is not so severe and serious as to have physical consequences is normally in the realm of the trivial, and so falls within the maxim that the law does not concern itself with trifles. It is likely to be so temporary, so evanescent, and so relatively harmless and unimportant, that the task of compensating for it would unduly burden the courts and the defendants. The second is that in the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional disturbance may be too easily feigned, depending, as it must, very largely upon the subjective testimony of the plaintiff; and that to allow recovery for it might open too wide a door for false claimants who have suffered no real harm at all. The third is that where the defendant has been merely negligent, without any element of intent to do harm, his fault is not so great that he should be required to make good a purely mental disturbance.

"c. The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law."

However, the evolution of the law on this subject did not stop with the adoption of the rules set forth in the Restatement. Further study made it apparent that the requirement of physical injury resulting from the emotional distress merely meant the replacement of one arbitrary, artificial rule with another which was only somewhat less restrictive. *E.g., Leong v. Takasaki,* 55 Hawaii 398, 520 P.2d 758 (1974); *Molien v. Kaiser Foundation Hospitals,* 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (banc 1980); *Culbert v. Sampson's Supermarkets Inc.,* 444 A.2d 433 (Me.1982). Also from a purely practical point of view, it was proving difficult if not impossible to separate physical injury from what was to be considered purely mental and emotional reaction. This problem had already been foreshadowed by Comment c to Section 436A of the Restatement, quoted above. *See also* the Annot., 64 A.L.R.2d 100 (1959) which stated in footnote 16 on page 115: "To refer to 'mental

distress alone' in these cases is undoubtedly somewhat inaccurate, since, as noted supra, § 3, severe mental disturbance of the type here treated is always characterized by a complex of physical reactions, and frequently it is only an accident of pleading that the adverse consequences complained of are characterized as 'mental' rather than physical."

The difficulty of a rule which attempts to distinguish between physical injury on the one hand from mental and emotional injury on the other is pointed up by a Missouri case, *Todd v. Goostree*, 493 S.W.2d 411 (Mo. App.1973), followed and implemented, 528 S.W.2d 470 (Mo.App.1975). In that case, a workmen's compensation claimant had been subjected to severe mental shock upon seeing a fellow worker crushed under the dump truck operated by the claimant. His claim was denied by the Industrial Commission on the ground that he was unable to show any injury to the "physical structure" of his body as required by the compensation statute. The denial of the award was reversed by the court of appeals on the ground that the broad objective of the Workmen's Compensation Act could be effectively accomplished "only if the distinction between physical and mental injury— *no longer tenable* —is discarded." (Emphasis added). The opinion went on to hold that the emotionally-induced neurosis was "violence to the physical structure of the body."

So, both for logical and also practical reasons, a considerable number of jurisdictions came to discard the requirement that the emotional distress must in turn produce physical injury. At the same time, these courts acknowledged the need to avoid unduly extending liability to situations where the defendant's acts constitute socially desirable activity and his blame is only slight, and these courts also agreed that recovery should not be extended to cases where the plaintiff has suffered only an inconsequential injury. To accomplish these objectives, the courts announcing the liberalized rule reemphasized the requirement that the in-

jury must be foreseeable and added the requirement that the plaintiff's injury must be serious in character. Cases announcing this liberalized point of view are: *Molien v. Kaiser Foundation Hospitals, supra; Leong v. Takasaki, supra; Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979); *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980); *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (1981); *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981); *Culbert v. Sampson's Supermarkets Inc., supra; Montinieri v. Southern New England Tel. Co.*, 175 Conn. 337, 398 A.2d 1180 (1978); *Taylor v. Baptist Medical Center, Inc.*, 400 So.2d 369 (Ala.1981); *Chappetta v. Bowman Transp., Inc.*, 415 So.2d 1019 (La.App.1982). *Contra Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982). Legal writing has expressed approval of this liberalization: Comment, *Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases*, 35 U.Chi.L.Rev. 512 (1968); Nolan and Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos*, 33 Hastings L.J. 583 (1982); Comment, *Duty, Foreseeability, and the Negligent Infliction of Mental Distress*, 33 Me.L. Rev. 303 (1981); Comment, *Molien v. Kaiser Foundation Hospitals: California Expands Liability for Negligently Inflicted Emotional Distress*, 33 Hastings L.J. 291 (1981).

A painstaking review of this whole subject has convinced this court that the time has come for Missouri to join the mainstream of Anglo-American jurisprudence by abandoning the classic impact rule. We are further of the opinion that logic and practicality argue in favor of avoiding any requirement that "physical injury" result from the emotional distress.

Instead of the old impact rule, a plaintiff will be permitted to recover for emotional distress provided: (1) the defendant should have realized that his conduct involved an unreasonable risk of causing the distress; and (2) the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be

medically significant.[4] Former decisions holding to the contrary are no longer to be followed.

### III.

It remains now to apply these new principles to the facts of this case.

█ With respect to foreseeability, there is considerable question whether these defendants could anticipate that an ordinary person normally constituted would succumb to serious emotional distress by reason of being trapped in a stalled elevator. On the record as it presently stands it is problematical whether the plaintiff made a submissible case on this question of foreseeability.[5] There is, however, no need to make a decisive evaluation of the scant evidence presently before this court, because upon retrial plaintiff will have an opportunity to introduce further evidence with respect to this matter. Various kinds of proof can be visualized which would tend to show some substantial foreseeable likelihood that either physical or psychic harm might be caused to a person trapped in the elevator.[6]

4. This test responds to well considered suggestions by legal writers. So, the Comment, *Negligently Inflicted Mental Distress: The Case for an Independent Tort*, 59 Geo.L.J. 1237, 1254 (1971) states:

"The crucial burden upon plaintiff in all tort cases lies in proving actual medical harm to the degree required by the law. In the context of mental distress, however, this burden of proof is complicated because of varying legal interpretations given the term 'mental distress.' Problems created by this threshold burden can be resolved by defining mental distress as any traumatically induced reaction which is medically detrimental to the individual. Courts, however, must translate such a medical definition into a purely legal standard capable of resolving particular cases. By defining this new tort in terms of a duty to refrain from inflicting 'severe' mental distress, medical concepts can be used as the starting point for legal analysis while still providing for flexible legal development capable of accommodating changing public policy needs. Under this approach, the plaintiff's threshold burden of proving legal damage would be satisfied upon demonstration of any medically provable mental distress or harm. The trier of fact would then apply the severity standard in order to determine if the harm is legally sufficient to warrant compensation."

Similarly, Comment, *Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases*, 35 U.Chi.L.Rev. 512, 517 (1968) states:

"The legal definition of 'emotional harm' largely determines the scope of emotional tort liability, a fact which traditional theory has implicitly recognized. A broad definition of 'emotional harm'—one which includes upset, anger, and grief—would make it easy to establish a 'threshold tort.' A very narrow definition—one which requires permanent emotional injury—would make it virtually impossible to establish the threshold tort, for psychic stimuli rarely if ever cause permanent damage in normal individuals. The difficulty of defining the 'emotional harm' necessary to establish a threshold tort in a way which produces results somewhere between the Scylla of unlimited liability and the Charybdis of no liability has probably been a primary factor in discouraging attempts to utilize the negligence approach in emotional injury cases.

"The necessary middle ground lies in a definition of 'emotional harm' which excludes mere upset, dismay, humiliation, grief, and anger. If one person's careless conduct causes another to experience such emotions, this conduct has not harmed him in a way which justifies the imposition of liability. Even aside from the problem of unlimited liability, it is unreasonable to require that people act so carefully as to avoid occasionally angering or upsetting others, just as it is unreasonable to demand that one never accidentally jostle another in a crowd.

"What 'harm,' then, is necessary to support a threshold tort? One example is 'shock'—the sudden agitation of the mental senses which temporarily incapacitates the victim and requires at least minimum medical attention. Other examples are continuing nervousness, sleeplessness, or nausea for which a physician would prescribe medication. Beyond this threshold are the neuroses, resulting psychosomatic disabilities, and other more serious illnesses. *'Harm,' then, is mental distress serious enough to require medical attention.*" (Emphasis added).

See also Comment, 33 Hastings L.J. 291, 309 (1981), and Comment c under Section 436A of Restatement (Second) of Torts, *supra.*

5. The evidence shows that the man who first answered plaintiff's calls admonished her not to panic. This might be considered some slight evidence of a belief by an average person that a person trapped in an elevator might in fact panic and become emotionally overwrought.

6. For example, the record does not disclose what maximum period of entrapment might

Where a possibility of proof exists which the plaintiff has not fully developed, a remand rather than reversal is permissible. *Stewart v. Brown,* 546 S.W.2d 204 (Mo.App. 1977); *Household Finance Company, Inc. v. Watson,* 522 S.W.2d 111 (Mo.App.1975); *Bolhofner v. Jones,* 482 S.W.2d 80 (Mo.App. 1972); *Franklin v. Farmers Mut. Ins. Co.,* 627 S.W.2d 110 (Mo.App.1982). This disposition of the appeal is especially called for in view of the new rules governing the subject matter which are newly announced in this opinion.

Of course, on the retrial defendants will have an opportunity to disprove any evidence offered by the plaintiff and also to persuade the jury that plaintiff's anxiety reaction was idiosyncratic and would not have occurred were it not for her currently pending divorce and the unfortunate stroke which her mother had recently suffered. All of this will basically be a question to be resolved by the usual judicial process of fact sifting and determination.

With respect to the issue of whether plaintiff's damages were sufficiently severe so as to be legally cognizable, the unilateral evidence so far offered would be sufficient to warrant jury submission. Of course this element also will be subject to dispute by defendants on retrial and will be a matter for jury determination.

The judgment of dismissal is reversed and this cause is remanded for new trial.

RENDLEN, C.J., HIGGINS and GUNN, JJ., and SEILER, Senior Judge, concur.

WELLIVER and DONNELLY, JJ., dissent in separate opinions filed.

BILLINGS and BLACKMAR, JJ., not participating because not members of the Court when cause was submitted.

WELLIVER, Judge, dissenting.

I respectfully dissent. Nothing in the facts of this case either compels or justifies our changing the law of this state in order to permit this plaintiff a possible recovery. If we are to recognize "injury without impact," we must also recognize that this flood of cases must be added to the already overcrowded docket of our courts or that we must add more courts; that the potential judgments must be added to the already oppressively high liability insurance premiums of this state; and every business being invited to locate in this state must consider this as one more factor in arriving at the cost of doing business in Missouri.

I believe that the time has come for the judiciary to exercise the same fiscal and economic responsibility that we would ask of the other branches of our government. *See Wolfgeher v. Wagner Cartage Service,* 646 S.W.2d 781, 786 (Mo. banc 1983) (Welliver, J. dissenting), decided today.

The prior opinion of the Missouri Court of Appeals, Eastern District, clearly and precisely states and follows the law of this state as it presently exists. The case was not transferred because of its failure to follow the law, but because of the desire of members of this Court to change the law. We should adopt the Missouri Court of Appeals opinion, attached to this dissent as Appendix A, as the opinion of this Court.

APPENDIX A

The opinion of the Missouri Court of Appeals, Eastern District, follows without use of quotation marks.

NORWIN D. HOUSER, Senior Judge.

This is a suit for damages for fright and mental distress unaccompanied by traumatic physical injury. The trial court sustained

reasonably be contemplated. While plaintiff here was released within a half hour to an hour, the method of release used would not have been possible had the elevator been much more than a foot from one of the floors. If the elevator had been further away than that, Faughn described the method of rescue as follows: "Then there's a side emergency, side exit in these elevators, and either myself or someone familiar with the operation can run another elevator up alongside it and come through the emergency side exit of another elevator, open it up, take them through the side exit." Nothing in the present record reflects how long such a rescue would take nor to what physical hazard the rescuee might be exposed.

a motion for a directed verdict for defendants at the close of plaintiff's case. Plaintiff has appealed. We affirm.

Collette Bass alleged in her petition that as a business invitee in Pierre Laclede Building in Clayton she entered an elevator owned by defendant Nooney Company and maintained by defendant Otis Elevator Company; that while attempting to ascend from the twentieth floor to the twenty-third floor, the elevator became stuck, thereby imprisoning her, causing her to sustain a severe anxiety reaction with hyperventilation syndrome, traumatic neurosis, and shock to her nervous and glandular systems.

Plaintiff's testimony: She entered the elevator and punched the button for the twenty-third floor. On the way up she heard "sort of a grinding sound" and the elevator stopped. It came to a "general" stop. There was nothing about the way the elevator came to a stop (apart from the grinding sound) that was any different from the other times she had ridden that elevator or other elevators in the building. Plaintiff was not thrown around in the elevator. She did not hit the side of the elevator or the door. Plaintiff waited a few minutes, thinking "it would resume its route." After about five to ten minutes she pushed the emergency bell and after a few minutes pushed it again. She could hear ringing, but there was no answer on the intercom. She pushed the emergency bell again, without any response. She called through the closed elevator door to people she heard in the hallway. No one could hear her, so she started hitting on the door and calling through the door, hoping someone would hear. Finally a man's voice asked, "Who is it?" Plaintiff gave her name and the name of her employer and told the man she had been stuck in there for several minutes. The man asked if she was alone and said, "Don't panic." Plaintiff asked him to notify her supervisor and contact maintenance. At that time plaintiff had been alone on the elevator for about fifteen or twenty minutes. Plaintiff pushed the emergency bell again. After ten minutes plaintiff's supervisor came and engaged in conversation about her condition. Plaintiff answered that she was all right but getting dizzy. A man, identified only as "Don," promised to contact someone and do what he could. Plaintiff walked to the "end" of the elevator and stood in a corner. She pushed the emergency bell again and again. She was getting warm. She "slid down to the floor" and started "feeling strange . . . feeling funny . . . light-headed . . . like [she] was getting ready to float, just real strange."

On the panel inside the elevator there were buttons marked "Door Open," "Door Close," "Alarm Bell," "Emergency Stop," and "Emergency Bell." Plaintiff did not push the "Door Open" or any button other than the twenty-third floor button and the emergency bell at any time she was in the elevator.

When maintenance arrived plaintiff was instructed to try to pull the door open with her two fingers while people on the outside did the same. (There were two doors that closed together and opened in the middle.) Eventually the doors opened. Plaintiff, with assistance, stepped out of the elevator onto the twenty-first floor. The elevator had stopped with the floor of the elevator about one foot above the twenty-first floor. Plaintiff boarded the elevator at about 10:45 a.m. When she "finally got out it was about a quarter to twelve."

Plaintiff was taken to the ladies' room. Her supervisor put a cold towel on her head and face. Plaintiff thought she "was okay but [she] felt dizzy." She was allowed to stay at her home station the rest of the day. She did not use the elevator any more, except at lunch time. A co-worker took her home after work. On the way she "starting drifting towards the [car] door and had to be straightened up." She felt "woozy." Next day she went to Jewish Hospital. Doctors in the emergency room advised admission to the hospital, where she was a patient in the psychiatric ward from Wednesday through Monday, taking sedatives and resting under the care of a psychiatrist. Upon examination of plaintiff, the

psychiatrist found some slurring of speech, her palms were very wet, she seemed to be hyperventilating (breathing more than usual), and her pupils were dilated. He diagnosed her case as a severe anxiety reaction and gave his medical opinion that the elevator incident caused the anxiety reaction. Plaintiff was off work from April 7 to May 2.

Plaintiff was under stress before this incident. She had been separated from her husband for fifteen years and was in the process of getting a divorce. She had the care of her three teenage children, who were living with her. She had no help in taking care of them. Her mother had suffered a stroke, and plaintiff was helping care for her.

Appellant's first point: The court erred in directing a verdict against plaintiff because she made a submissible case under the doctrine of res ipsa loquitur. It is not necessary to rule this point since plaintiff failed to make a submissible case under the physical injury rule. This failure is fatal to her case regardless of whether she proved negligence.

Appellant argues that she made a submissible case under the physical injury rule by virtue of her acts of physically pushing the emergency bell; physically hitting on the door to attract attention, and pulling on the door with two fingers in an attempt to open it. This argument in untenable. Under the physical injury rule, "[t]o sustain recovery for emotional distress and bodily harm resulting therefrom, plaintiff must suffer a traumatic physical injury through the fault of defendant, unless there is extreme and outrageous conduct on the part of the defendant intentionally or recklessly causing the emotional distress." *Williams v. School District,* 447 S.W.2d 256, 266 (Mo.1969). There is no claim and no basis for a claim of outrageous, intentional, or reckless conduct on the part of defendants.

The fault of which plaintiff complains is that the elevator "stuck"—that it stopped. The evidence is that it came to a "general" stop, no different from other times. The word "general" as used in this context,

means common or typical and denotes that which is usual or often met with. *Webster's Third New International Dictionary* 944 (Unabridged Ed.1976). Plaintiff conceded that she was not thrown about and that she did not hit the sides or door of the elevator. There is no evidence or contention that the elevator stopped suddenly or violently; that there was any jerk, jolt, shaking, or unusual movement; that the stop caused plaintiff to fall to the floor; or that she sustained trauma of any kind to her body because of the stopping of the elevator. Plaintiff's slight, trivial, minor physical contacts with the elevator when she pushed the emergency bell button and tried to open the door with her hands and fingers were insufficient to constitute the "traumatic physical injury" required by the *Williams* case and its progenitors to activate the physical injury rule. Furthermore, pushing the bell and hitting on the door were the conscious, deliberate acts of plaintiff associated with her state of mind— based on her own mental reaction—contacts that did not take place because of any actions of defendants. In *Spohn v. Missouri Pacific Railway,* 116 Mo. 617, 22 S.W. 690 (1893), a passenger overheard a conversation between the conductor and another passenger relating to tying up and robbing someone. Imagining that he was the intended victim the passenger, fearing for his safety, attempted to alight from the moving train, thereby sustaining serious personal injuries. He sued for damages for physical and mental anguish. On appeal, the Supreme Court reversed a judgment for plaintiff, holding that plaintiff's physical injuries were the result of his own imagined fear and his attempt to save himself and that it was plaintiff's own state of mind, imagination or paranoia, and not defendant's actions, that caused his fear and injuries. In *Francis v. St. Louis Transfer Co.,* 5 Mo.App. 7 (1877), the court denied plaintiff damages for injuries sustained and illness contracted when she walked home from the place defendant put her off the wagon, on the ground that it was her own refusal to ride a nearby street car that occasioned her difficulties.

Nor was there any showing that plaintiff's hands or fingers were *injured* by her pushing the bell button, hitting and prying on the door, or that there was any nexus between those contacts with the elevator and plaintiff's subsequent anxiety reaction. In *State ex rel. Renz v. Dickens,* 95 S.W.2d 847 (Mo.App.1936), the appellate court affirmed an order sustaining a demurrer to plaintiff's evidence on the ground that there was no evidence "that [plaintiff] fell down or that she received a bruise, a scratch, a bump or any other kind of physical wound or injury by her husband pushing her, which would afford a basis for an inference to account for the condition of her health." *Id.* at 851. There must not only be a traumatic physical injury resulting from defendant's negligence (and not resulting from plaintiff's own actions), but also the *traumatic injury must be the proximate cause of the mental distress suffered by the plaintiff,* under the Missouri decisions. In *Chawkley v. Wabash Railway,* 317 Mo. 782, 297 S.W. 20 (banc 1927), plaintiff was riding in an automobile with her family when a train collided with the car, injuring her and killing her husband and children. She suffered personal injuries and great emotional distress at the sight of the bodies of her husband and children. Reversing a judgment for plaintiff for error in admission of evidence of mental and physical injuries caused by the sight of the bodies of the members of her family, the Court held that proximate cause is an essential element of the physical injury rule and that plaintiff may not recover for emotional injuries not "directly caused by a physical injury. The plaintiff could not recover for impairment ... in her physical and mental condition, unless that particular impairment could be traced directly to the physical shock or physical wounds or bruises inflicted upon her." *Id.* at 808, 297 S.W. at 29.

Plaintiff failed to prove both of these indispensable constituent elements of a claim for relief for mental distress.

Appellant urges that if she fails on her first point this Court reexamine and overrule the physical injury rule "to bring the law in Missouri relating to mental equilibrium and psychic injuries ... under the same protection that is now extended to physical well being ... by the majority of other jurisdictions." Appellant argues that the reasons given in support of the rule[1] are unsound and in support of her thesis cites and quotes from various treatises, law review articles, and decisions from foreign jurisdictions. Three earlier Missouri cases[2] refer to these as the reasons "generally stated" in support of the rule, but an analysis of the long line of Missouri decisions by which the physical injury rule has been entrenched in Missouri law reveals that our courts have stated and relied upon other more basic and convincing reasons.

Foremost among these fundamental reasons is the pragmatic rule of social necessity. In our complex modern society ever-increasing numbers of people are served daily by electrically energized devices and machines serving human needs in the fields of transportation, communication, and commerce; devices that through advanced technology and electronic wizardry, are becoming ever more automated. Automatic devices and mechanical contrivances are not foolproof. Humanity has never lived a perfect world, and the miracles of science are not perfect or infallible. Inevitably breakdowns and failures of electrical and mechanical devices occur, with attendant mental distress; frights; unpleasant, shocking, or horrifying experiences; missed connections and other annoyances; inconveniences; and frustrations. Nowhere in the Constitution or laws, however, is it written that every citizen is entitled to perfection or

---

1. (1) Medical science's difficulty in proving causal connection between the alleged fright and the alleged negligent act;

(2) Fear that the courts would be faced with numerous fraudulent or exaggerated claims;

(3) Fear that a flood of litigation, overwhelming the court, will be precipitated.

2. *Harless v. Southwest Mo. Elec. Ry.,* 123 Mo. App. 22, 99 S.W. 793 (1907); *Kennedy v. St. Louis Transit Co.,* 103 Mo.App. 1, 78 S.W. 77 (1903); *Strange v. Missouri Pac. Ry.,* 61 Mo. App. 586 (1895).

complete freedom from worry, upset, or mental distress. For the state to function without constant strife, it is necessary that certain of these malfunctions be accepted and tolerated, as long as they are unaccompanied by traumatic physical injury, as part of the price to be paid for membership in society, without resort to the courts for the redress of every imaginable grievance.[3]

In *McCardle v. George B. Peck Dry Goods Co.,* 271 Mo. 111, 195 S.W. 1034 (1917), plaintiff was a passenger on an elevator which failed to stop at the first floor and passed on down to the bottom of the shaft in the basement, striking the bottom with a thud. She testified that she suffered severe nervous shock, pain, and other physical symptoms, but there was testimony indicating that she did not suffer any physical injury. The Supreme Court upheld an instruction that plaintiff could not recover from fright, terror, alarm, anxiety, or distress of mind resulting from the descent of the elevator "if these were unaccompanied by some physical injury" and that if plaintiff's condition "is the result of fright or scare only" then plaintiff could not recover. *Id.* at 120, 121, 195 S.W. at 1036.

In *Pretsky v. Southwestern Bell Telephone Co.,* 396 S.W.2d 566 (Mo.1965), defendant's repairman entered plaintiff's home by falsely stating that there was trouble on her telephone line. Plaintiff became concerned about the truthfulness of his statements and his purpose in entering the premises, as a result of which plaintiff suffered extreme anxiety, fright, and emotional upset. Denying recovery for mental distress the Supreme Court, *id.* at 569, said:

> The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

In *Brisboise v. Kansas City Public Service Co.,* 303 S.W.2d 619 (Mo. banc 1957), defendant's streetcar operator made loud noises and movements with the streetcar in an attempt to force plaintiff's automobile off the tracks. Plaintiff had parked her car temporarily on the streetcar tracks. She suffered mental distress and paralysis as a result of the confrontation. The Supreme Court denied recovery for mental distress, stating that "[m]odern affairs could not be carried on if all were required to regulate their conduct to conform to the temperaments of individuals abnormally susceptible to emotional disturbances." *Id.* at 626, 303 S.W.2d at 626.

In *Trigg v. St. Louis, Kansas City & Northern Railway,* 74 Mo. 147 (1881), defendant's train carried plaintiff past her destination, and plaintiff had to travel back by handcar the next day. The Supreme Court denied recovery for mental distress not caused by physical injury, observing that the delay in her journey caused by the train mistakenly passing her station was an event reasonably to be expected in modern affairs, stating:

> The general rule is that "pain of mind, when connected with bodily injury, is the subject of damages; but it must be so connected in order to be included in the estimate, unless the injury is accompanied by circumstances of malice, insult or inhumanity." ... If anxiety and suspense of mind are not a ground of recovery here, of course the effects are not.

*Id.* at 153 (citation omitted). In this connection see *Porter v. St. Joseph Railway, Light, Heat, & Power Co.,* 311 Mo. 66, 71–72, 277 S.W. 913, 914 (banc 1925); *Weissman v. Wells,* 306 Mo. 82, 99, 267 S.W. 400, 406 (1924); cases cited in *Brisboise,* 303 S.W.2d at 625.

Another basic reason underlying the physical injury rule is that it is unfair,

---

3. Where, however, mental distress is caused by extreme or outrageous conduct—acts which are willful, intentional, malicious, or inhumane—the law should, and does, provide a legal remedy. *Dalzell v. Dean Hotel Co.,* 193 Mo.App. 379, 186 S.W. 41 (1916); *Wilson v. St. Louis & S.F.R.R.,* 160 Mo.App. 649, 142 S.W. 775 (1912); *Harless v. Southwest Mo. Elec. Ry.,* 123 Mo.App. 22, 99 S.W. 793 (1907).

impractical, and unjust to impose liability for mental distress and physical ailments resulting from mental anguish, when accompanied by physical injury, because they are not foreseeable: mental distress, which is a state of the mind, is largely dependent upon the peculiar temperament of the individual, is subjective, results from conditions within the brain and sense organs, and is conditioned by characteristics of the mind, that cannot be reasonably be expected to be anticipated or known of beforehand.

In *Francis v. St. Louis Transfer Co.*, 5 Mo.App. 7 (1877), plaintiff's illness, contracted while walking home after defendant put her off its conveyance a distance from her home, was held unforeseeable.

In *Connell v. Western Union Telegraph Co.*, 116 Mo. 34, 22 S.W. 345 (1893), a father's mental distress and physical consequences, where the telegraph company failed to timely deliver a message that his son was dying, were held not in the contemplation of the defendant. The damages were "uncertain, indefinite, unascertainable, dependent so largely on the peculiar temperament of the person suffering the delay." *Id.* at 48, 22 S.W. at 349.

In *Crutcher v. Cleveland, Cincinnati, Chicago & St. Louis Railroad,* 132 Mo.App. 311, 111 S.W. 891 (1908), a plaintiff's nervousness, menstrual hemorrhage, and other physical injuries following an abrupt confrontation between a railroad conductor and a passenger who did not have the proper ticket were held not actionable because unforeseeable. It was said to be almost impossible for reasonable men to guard against such injuries where there is no initial physical injury.

In *Brisboise,* the Supreme Court, denying recovery for mental anguish and its physical consequences, relied in part upon unforseeability, in these words: "To hold present day users of city streets liable under the factual allegations of plaintiff's Petition would extend their foresight beyond the standards established by law." 303 S.W.2d at 627.

A further policy consideration is the impossibility of justly assessing compensatory damages within the required standards of accuracy and certainty in view of the wide variance in the degree of suffering experienced by different people with differing reactions and sensitivities. Such damages, not flowing from traumatic injury but originating in the mind of the claimant, are sentimental, abstruse, and metaphysical in character, in some cases the product of an excited imagination, and therefore not ascertainable under conventional standards established in the law of damages. Consequently, any such award of damages, necessarily based upon guesswork, would be punitive in nature rather than compensatory, and punitive damages cannot be awarded in cases involving negligent conduct (as contrasted with willful, intentional, malicious, or reckless conduct). *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596, 603 (Mo.1968). This concept was well stated in *Connell,* 22 S.W. at 348, as follows:

The reason why an independent action for such damages cannot and ought not to be sustained is found in the remoteness of such damages, and in the metaphysical character of such an injury, considered apart from physical pain. Such injuries are generally more sentimental than substantial. Depending largely upon physical and nervous condition, the suffering of one under precisely the same circumstances would be no test for the suffering of another. . . . That damages so imaginary, so metaphysical, so sentimental shall be assessed by a jury with justness, not by way of punishment to the defendant, but as mere compensation to plaintiff, is not to be expected.

In *McCardle,* the Supreme Court quoted with approval from a Massachusetts case in which it was stated that

the general conduct of business and of the ordinary affairs of life, must be done on the assumption that persons who are liable to be affected thereby are not peculiarly sensitive, and are of ordinary physical and mental strength. . . . [A]s a general rule, a carrier of passengers is not bound to anticipate or to guard against an injurious result which would only hap-

pen to a person of peculiar sensitiveness.... One may be held bound to anticipate and guard against the probable consequences to ordinary people, but to carry the rule of damages further imposes an undue measure of responsibility upon those who are guilty only of unintentional negligence.

271 Mo. at 120–21, 195 S.W. at 1036.

The basic reasons for the physical injury rule, which has been the law of this state for more than a century, are as sound and satisfactory in the age in which we live as they were when first announced. We follow the lead of the many precedents on our books and recall what the Supreme Court said in the *Connell* case, 22 S.W. at 348:

A doctrine which has passed so long unchallenged by the great jurists who have adorned the bench of our state and federal courts is not to be lightly discarded at the behest of ingenious and able counsel. The law is, and ought to be, more stable than this. It has long been the boast of common-law writers that the common law was a system founded upon reason; and one of its maxims has ever been that, when the reason upon which a law was based ceased, the law itself ceased. Speaking for ourselves, we are satisfied that the common law, denying an action for mental distress alone, was founded upon the best of reasons and an enlightened public policy.

Applying these well-established principles to the facts of this case, there was no traumatic physical injury and therefore plaintiff's physical suffering was not and could not have been proximately caused by a traumatic physical injury. There was a minor malfunction of an elevator. It stalled; an event which, although not an everyday occurrence, does occasionally happen and is not entirely unexpected in modern affairs. Plaintiff understood that people have problems with elevators. This elevator, to the knowledge of plaintiff, was equipped with buttons for stopping, opening and closing the door, and emergencies; alarms; intercom; and an escape door in the side of the elevator. She had been instructed by maintenance that if building employees had any problem they should push the emergency button "and someone would respond on the intercom and talk to you while you were in the elevator if there has been a problem." When the problem arose, however, plaintiff experienced an emotional reaction when there was no response to the emergency bell. Plaintiff, who admitted that before this incident happened she was "somewhat" under stress (in the process of getting a divorce, family problems with caring for three teenagers and her ailing mother, "and working"), got a "funny feeling," became light-headed and dizzy, began hitting the door, and slid down in a corner. There is no mention that plaintiff feared that the elevator would fall. That was not her worry. Her concern related solely to her imprisonment, and as it bears upon plaintiff's loss of composure the record raises the unanswered question why she did not push the "Door Open" button. There was no power failure inside the elevator. Number "23" lighted when plaintiff entered the elevator and pushed the button for the twenty-third floor. The interior elevator lights remained illuminated. The emergency button was working (plaintiff as well as persons in the hallway heard the alarm bell ringing). Plaintiff admitted she was aware of the "Door Open" button, that "Door Open" was clearly printed thereon, that she knew its purpose was to open the door, but that at no time while in the elevator did she press the "Door Open" button. Based on these conceded facts it appears that by the simple expedient of pushing the "Door Open" button she could have released herself and stepped out of the elevator onto the twenty-first floor, but in her emotional state she did not push that button. Plaintiff's dizziness, hyperhydrosis, hyperventilation, speech difficulty, and pupil dilation originated not in trauma but in her mind and resulted not from defendants' negligence but from plaintiff's hypersensitivity, failure to control her emotions, imagination, and expressed fear that, like her mother, she was about to experience a stroke.

Plaintiff's sufferings were not reasonably foreseeable; any damage verdict rendered under the evidence would be unjust because of the metaphysical character of plaintiff's

suffering and would constitute an award of punitive damages, which can be assessed where the defendant does a wrongful act intentionally and without just cause or excuse [where there is "some element of wantonness or bad motive," *Pollock v. Brown,* 569 S.W.2d 724, 733 (Mo. banc 1978)], but may not be assessed in an action based upon simple negligence.

Under the physical injury rule there was no error in sustaining defendant's motion for a directed verdict.

The judgment is affirmed.

DONNELLY, Judge, dissenting.

I respectfully dissent for at least two reasons:

(1) In my view, this case does not demonstrate appropriate circumstances for judicial abrogation of the "impact rule". "The issue seems suited for legislative action." *Epple v. Western Auto Supply Co.,* 557 S.W.2d 253, 254 (Mo. banc 1977); and

(2) The view of the majority is that "logic and practicality" argue for abandonment of the "impact rule" in favor of a "medically significant" rule. The "logic and practicality" of such action elude me. What does "medically significant" mean in a courtroom?